STATE OF NEBRASKA, APPELLEE, V.
JEREMY GARNER, APPELLANT.
614 N.W.2d 319

Filed July 21, 2000. No. S-99-1396.

Thomas C. Riley, Douglas County Public Defender, for appellant.

Don Stenberg, Attorney General, and Martin W. Swanson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

Following the homicide of an elderly woman, the appellant, Jeremy Garner, confessed to committing the crime. At the time he made his statement to police, Garner was 15 years old, had been interviewed for several hours beginning at approximately 2 a.m., and did not have a parent or guardian with him. During their interview of Garner, police made reference to public perception of the crime, stating that the public would view Garner as a "monster" and would call for him to be put to death in the electric chair. Garner was tried to a jury as an adult and con-

victed of first degree murder. The primary issue on appeal is whether Garner's confession was voluntary. Garner also alleges that the district court erred in refusing his requested jury instruction regarding whether the confession was voluntary and in refusing to allow into evidence for the truth of the matter asserted tape recordings of a statement made to police by Antonio Johnson, an 11-year-old boy, in which Johnson briefly implicated himself in the crime. We affirm.

## BACKGROUND

On Sunday, March 29, 1998, a relative discovered the body of Sally Leu at the bottom of the basement stairs in her home. Leu was an 82- or 83-year-old woman who lived alone. The police were called, and Officer Melvin McCowen, along with other officers, went to the scene. At the bottom of the stairs, police discovered a white towel with blood, several cans of food, a rock, two canes, and a piece of concrete. The rock and cans appeared to have blood on them. Police discovered a red plastic gas can near the garage. It was later determined that Leu had been beaten and had died from blunt trauma to the head, chest, and upper extremities. Missing from the home were a gray telephone receiver, a jewelry box, and Leu's billfold.

### JOHNSON'S STATEMENT

Following the inspection of the crime scene, the police spoke with Dawn Gautier, a neighbor of Leu. Gautier told police that on Saturday, March 28, 1998, she saw a black teenager at Leu's doorstep. Gautier saw the teenager talk to Leu, then push her arm down and enter her home. At trial, Gautier identified the youth as being Garner. As part of their investigation and before Garner was established as a suspect, police officers went to speak with Johnson, an 11-year-old youth who was identified as a possible suspect. The record indicates that Johnson had previously harassed Leu. Johnson was picked up by the police and interviewed beginning at 9:15 p.m. on Sunday, March 29. The record indicates that the interview lasted until approximately 4 a.m., March 30. Johnson was then transported to a hospital, where blood was drawn.

During the interview, the interviewing officer misrepresented to Johnson that police had found his fingerprints in Leu's house

and that witnesses had seen him at her house. Johnson repeatedly insisted that he was not involved in Leu's death, and the record indicates that he was emotionally upset. Johnson repeatedly asked when he could go home or indicated that he wanted to go home. The requests were either denied or were generally ignored by the interviewers. Johnson began crying during the interview. Johnson also told the officers that he was sleepy. At trial, Johnson testified that he was tired and at times fell asleep when there was a break in the questioning. At one point in the interview, following his repeated inquiries about going home, Johnson indicated that he had pushed or hit Leu, possibly with a hammer. However, when officers pointed out inconsistencies in Johnson's story with the facts of the case, Johnson stated that he had made up the story so that he could go home and go to bed. At trial, Johnson testified and stated that he told the police at one point that he had committed the crime because he thought they would let him go home. Johnson also provided testimony regarding the manner in which the police interviewed him. The officers who interviewed Johnson also provided detailed testimony regarding the manner in which he was interviewed and about his statement that he struck or pushed Leu.

Garner sought to have Johnson's taped statement played to the jury. The State objected on the bases of hearsay and relevance. Before trial, the district court ruled that testimony regarding Johnson's statement could be used to illustrate police interview techniques and to impeach, but, absent additional foundation set forth outside the presence of the jury at trial, it could not be used to prove the truth of the matter asserted. At trial, the court refused Garner's request to play the tapes. The court stated that if parts of the tapes would demonstrate an interview technique by tone or inflections of the voice, those portions could be played. However, based on its prior determination of the issue, the court stated that the tapes could not be used at all for the truth of the matter asserted.

### Garner's Statement

After police spoke with Johnson, McCowen and other officers went through the neighborhood inquiring if anyone had information about the homicide. During this time, they encoun-

tered several youths who indicated that they had information. One of the youths told McCowen that a boy named "Jeremy" in "an ESP program" at school told him that he had beaten Leu and had pushed her down the steps. The youth stated that Jeremy had also previously asked him to help break into Leu's house. The other youths told police that they thought Jeremy's last name was "Mason," that he lived directly north of Leu's house, and that on Saturday, March 28, 1998, they saw him with a gray telephone receiver. Following the conversation with the youths, the officers obtained information from the Omaha public schools that Garner lived with his grandmother, whose last name was Mason. The police also verified that Garner had previously resided in the house north of Leu's.

Based on the information obtained about Garner, McCowen obtained a search warrant for Garner's home. The warrant was executed at approximately 1:30 a.m. on March 31, 1998. Upon arrival at the residence, police knocked on the door, and Garner answered. Garner then got his grandmother. Both Garner and his grandmother agreed that Garner could go to police headquarters to discuss the homicide. McCowen informed Garner's grandmother of where they would be and gave her a telephone number where they could be reached. McCowen could not remember if he told Garner's grandmother that he would bring Garner back to the house later, or if he invited her to accompany them to the headquarters. Garner was not handcuffed during the drive to police headquarters.

At headquarters, McCowen advised Garner of his *Miranda* rights. Garner then agreed to talk to McCowen and another officer. The interview began at 2:16 a.m., concluded at 5:06 a.m., and was audiotaped. Garner denied any involvement in the homicide for approximately the first 1½ hours. Garner stated that he had been at Leu's house on Saturday to do chores for her and that she had paid him and had given him a little blue radio. As the interview progressed, the officers began to accuse Garner of lying and pointed out inconsistencies in his story. In particular, Garner told the officers that he learned about Leu's death Saturday night on the news. However, the police, and hence the news, were not aware of Leu's death until Sunday. The officers pointed these inconsistencies out to Garner, but he continued to

maintain his innocence. Throughout the interview, the officers indicated to Garner that they believed he was responsible for Leu's death but that they did not think he intentionally set out to kill her. The officers also repeatedly employed a method of interrogation in which they told Garner how bad the situation would appear to others, followed by the suggestion that this was Garner's chance to explain what really happened. At one point in the interview, the following statements were made:

> McCowen: You know what it looks bad as? How it looks bad? Here's this 83-year-old white woman, living alone; she's helping people in the neighborhood.
>
> Garner: Yeah.
>
> McCowen: And then here's this young black man that killed her, trying to take her money. Um, it's gonna be nothing but sensational in the paper.
>
> Garner: Uh huh.
>
> McCowen: People are going to [be] calling that kid a monster. They're gonna be asking for the death penalty for him. But you know what the other part is? Probably they don't understand what happened.

Later during the interview, McCowen stated the following:

> McCowen: [B]elieve me you're gonna want people to know what happened, 'cause they're gonna think so much bad shit about you, that you gonna, you gonna beg them to see what happened. Please don't think I'm this kind of person. 'Cause they'll be wanting to kill ya. They'll want to stick you in the electric chair and burn your butt forever for killing an 83-year-old white woman, when there may be more to it than that.

After making this statement, McCowen and the other officer continued to talk to Garner for approximately 27 minutes. During that time, the officers appealed to Garner's conscience and continued to urge him to tell the truth and to take the opportunity to explain his side of the story. Following these additional statements, Garner confessed to committing the crime. McCowen testified that his reference to the electric chair was part of an interview technique in which the officer explains how the public is going to view a crime. McCowen stated that he did not threaten Garner with the death penalty. McCowen also testi-

fied that he did not actually believe that the death was an accident, but was downplaying the circumstances as a technique in trying to get Garner to tell the truth.

During the interview, the officers did not raise their voices. Rather, the tapes indicate that the officers exhibited a calm demeanor throughout the interview. McCowen testified, and the record reflects, that during the interview, Garner never asked for his grandmother, a parent, or anyone else. McCowen also testified that Garner never indicated that he was sleepy or wanted to stop the interview. The district court made a finding of fact that Garner did not appear to be under the influence of alcohol or a controlled substance and that there was no indication of mental confusion. McCowen provided testimony to this effect.

At approximately 4 a.m., Garner admitted to committing the homicide, and a taped formal statement of his confession was made. Garner stated that after doing chores for Leu, she complained to him about Johnson, which made him nervous. Garner then stated that he went to the kitchen and got a pan and a knife and that he brought a dish towel to cover up fingerprints. Garner stated that he then hit Leu and pushed her down the stairs to the basement. Garner stated that he saw two canes at the bottom of the stairs and first hit Leu with one for a while, but it was not strong enough, so he hit her with the other one. Garner stated that he then started to clean up the blood with the dish towel and a bath towel. He next took a brick off a shelf and repeatedly threw it at Leu. Garner then went to get a gas can, thinking that he would pour gasoline on Leu, but changed his mind and put the can back. Garner stated that he saw some cans of food and threw those on Leu instead. Following this, Garner stated that he cut the telephone cord, hit Leu with the cane several more times, and left. A wallet and other items identified as belonging to Leu were later found in a trash can behind Garner's residence. Before trial, Garner filed a motion to suppress his statement to the police. The district court overruled the motion. During trial, Garner's formal statement to police was played to the jury over his objection.

### JURY INSTRUCTIONS

The jury was given jury instruction No. 19, adapted from NJI2d Crim. 6.0, which stated in part:

There has been evidence that defendant, Jeremy Garner, made a statement to law enforcement officers. You may rely on any such statement only if you decide beyond a reasonable doubt:

(1) that the defendant made the statement; and

(2) that the defendant understood what he was saying; and

(3) that the statement was freely and voluntarily made under all the circumstances surrounding its making.

Garner sought to modify the instruction by adding the following sentence: "that the statement was freely and voluntarily made and not the product of threats, coercion or inducements of leniency." The district court denied Garner's requested instruction, stating that the unmodified instruction would sufficiently advise the jury, and gave counsel full opportunity and latitude to argue the issues. In his closing statements, Garner's counsel focused his argument on the theory that the statement was involuntary as the result of threats or coercion. The jury found Garner guilty, and he appeals.

## ASSIGNMENTS OF ERROR

Garner assigns that the district court erred in (1) denying his motion to suppress his statement to the police and admitting the statement into evidence over his objection, (2) rejecting his jury instruction on the issue of the voluntariness of his statement to police, and (3) precluding him from introducing as substantive evidence Johnson's confession to the crime.

## STANDARD OF REVIEW

■ A district court's finding and determination that a defendant's statement was voluntarily made will not be set aside on appeal unless this determination is clearly erroneous. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000); *State v. Martin*, 243 Neb. 368, 500 N.W.2d 512 (1993).

■ In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by such rules, not judicial discretion, except in those instances under the rules when judicial discretion is a factor involved in the admissibility of evidence. *State v. Kinser*, 259 Neb. 251, 609 N.W.2d 322 (2000); *State v. Myers*, 258 Neb. 300, 603 N.W.2d 378 (1999).

■ Whether jury instructions given by a trial court are correct is a question of law. *State v. Bjorklund, supra.* To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Brown,* 258 Neb. 330, 603 N.W.2d 419 (1999); *State v. Owens,* 257 Neb. 832, 601 N.W.2d 231 (1999).

## ANALYSIS

### ADMISSIBILITY OF GARNER'S CONFESSION

Garner contends that McCowen's references to the death penalty rendered his confession involuntary because it was the product of threats, coercion, and inducements of leniency. In making this argument, Garner contends that his age, the time of day, and the fact that he was without counsel or a parent were factors affecting the involuntary nature of his confession.

■ The Due Process Clause of U.S. Const. amend. XIV and the due process clause of Neb. Const. art. I, § 3, preclude admissibility of an involuntary confession. *State v. Mantich,* 249 Neb. 311, 543 N.W.2d 181 (1996). See, also, *State v. Chojolan,* 253 Neb. 591, 571 N.W.2d 621 (1997) (statements made after *Miranda* rights are given are required to be made voluntarily). The State has the burden to prove that a defendant's statement was voluntary and not coerced. *State v. Chojolan, supra.* In making this determination, a totality of the circumstances test is applied, and the determination reached by the trial court will not be disturbed on appeal unless clearly wrong. See, *id; State v. Ray,* 241 Neb. 551, 489 N.W.2d 558 (1992); *State v. Stewart,* 197 Neb. 497, 250 N.W.2d 849 (1977), *disapproved on other grounds, State v. Palmer,* 224 Neb. 282, 399 N.W.2d 706 (1986).

■ While the circumstances surrounding the statement and the characteristics of the individual defendant at the time of the statement are potentially material considerations, coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the 14th Amendment. *Colorado v. Connelly,* 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986); *State v. Ray,*

*supra*; *State v. Brewer*, 241 Neb. 24, 486 N.W.2d 477 (1992). Thus, the inquiry is whether the trial court was clearly wrong in finding that police conduct, in the context of the totality of the circumstances, did not render the accused's confession involuntary. *State v. Ray, supra.*

 The confession of an accused may be involuntary and inadmissible if obtained in exchange for a promise of leniency. *State v. Martin*, 243 Neb. 368, 500 N.W.2d 512 (1993); *State v. Porter*, 235 Neb. 476, 455 N.W.2d 787 (1990). However, mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or promise, does not make a subsequent confession involuntary. See *State v. Ray, supra.*

 While the accused's minority is a factor to consider when determining the voluntariness of a confession, it is not determinative. *State v. Chojolan, supra.* We have also held that where an accused did not appear to be tired and appeared to comprehend what was happening, the trial court was not clearly wrong in determining that a statement made after 14 hours in custody was voluntary. *Id.*

 In this case, McCowen did not refer to the death penalty in connection with an explicit threat or promise of leniency. Rather, McCowen briefly referred to the death penalty in relation to what the public perception would be regarding the crime. Although there was no explicit threat that Garner would receive the death penalty if he did not cooperate, we have stated that the possibility remains that under certain circumstances, a promised benefit (such as a promise not to pursue the death penalty if the accused tells the truth) might be inferred from an officer's statements to an accused. See *State v. Martin, supra.* However, any such inference must be reasonable. See, generally, *id.* In addition, we have stated that the benefit offered to a defendant must be definite and must overbear his or her free will in order to render the statement involuntary. *State v. Walker*, 242 Neb. 99, 493 N.W.2d 329 (1992); *State v. Ray, supra.* Although we do not condone McCowen's use of death penalty references, the references do not, in and of themselves, render Garner's subsequent confession involuntary. Several courts have indicated that a brief reference to the death penalty will not render a state-

ment involuntary when the statement merely illustrates the seriousness of the crime and the defendant's will was not overborne as a result of the statement. See, *State v. Martinez*, 127 N.M. 207, 979 P.2d 718 (1999) (reference to death penalty was attempt to impress appellant with seriousness of crime, did not rise to level of misconduct, and did not cause his will to be overborne); *Conner v. State*, 334 Ark. 457, 982 S.W.2d 655 (1998); *State v. Andrus*, Nos. 9504004126 and 9504002666, 1996 WL 190031 (Del. Super. Jan. 16, 1996) (appellant did not demonstrate that officer's brief comments regarding death penalty constituted government's overreaching or that comments were factor that caused him to confess).

The trial court in this case heard the audiotapes of the interview and, thus, was able to make detailed factual findings. The trial court stated that over the course of the 3-hour interview, McCowen mentioned the death penalty only twice. As previously discussed, the references to the death penalty were made in the context of a continued effort by the officers to illustrate to Garner how the public would view the crime. The references were not made in the context of a threat or a promise of leniency. The trial court found that McCowen's statements to Garner regarding the death penalty were stated quickly and were quickly rebuffed by Garner each time. Further, a considerable amount of time passed between McCowen's second statement regarding the death penalty and the time when Garner confessed. During this time, the officers appealed to Garner's conscience and continued to urge him to tell the truth. The trial court determined that there was no apparent indicia that Garner's will was overcome as a result of the officers' remarks. The trial court further found that the officers made no promises or inducements and did not threaten or intimidate Garner. The record supports the trial court's factual findings. We conclude that the trial court was not clearly wrong in concluding that Garner's statement was voluntary. Thus, Garner's statement was properly entered into evidence.

## JURY INSTRUCTIONS

Garner next contends that the trial court erred in refusing his requested jury instruction regarding the voluntariness of his

statement. The jury instruction given at trial was adapted from NJI2d Crim. 6.0 and stated:

> There has been evidence that defendant, Jeremy Garner, made a statement to law enforcement officers. You may rely on any such statement only if you decide beyond a reasonable doubt:
>
> (1) that the defendant made the statement; and
>
> (2) that the defendant understood what he was saying; and
>
> (3) that the statement was freely and voluntarily made under all the circumstances surrounding its making.

The comment to NJI2d Crim. 6.0 states that "[i]t may be necessary in a particular case to supplement this instruction by adding a numbered paragraph (4) that provides more specific information regarding a particular case." As a result, Garner sought to modify the instruction by adding the following sentence: "that the statement was freely and voluntarily made and not the product of threats, coercion or inducements of leniency."

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Brown*, 258 Neb. 330, 603 N.W.2d 419 (1999); *State v. Owens*, 257 Neb. 832, 601 N.W.2d 231 (1999).

The jury instruction requested by Garner was a correct statement of the law. Because Garner was alleging that his statement was involuntary due to police threats, coercion, or an implied promise of leniency based on the references to the death penalty, his requested instruction was also warranted by the evidence. We conclude, however, that Garner was not prejudiced by the court's refusal to give the requested instruction. Although the instruction requested by Garner was a correct and more complete statement of the law, the instruction given by the trial court was also correct. Further, the court did not preclude Garner's attorney from arguing to the jury that Garner's statements were the product of threats, coercion, or inducements of leniency, and Garner's attorney made such arguments to the jury. Thus, we conclude that while it would have been better if the trial court

had instructed the jury as Garner requested, its failure to do so is not reversible error.

## ADMISSIBILITY OF JOHNSON'S STATEMENT

Before addressing this issue, we pause to comment about the interrogation tactics used in obtaining Johnson's statement. The record reflects that Johnson, an 11-year-old child, was detained at the police station for approximately 7 hours. Much of the interrogation took place in the absence of Johnson's mother, even after he indicated to the officers that he wanted to see her. Johnson was obviously tired and fell asleep during portions of the interrogation. Johnson began crying during the interview, repeatedly asked the officers when he could go home, and eventually made up a story because he thought he would then be allowed to go home. This method of interrogation, particularly when used on such a young child, is most troubling to this court. However, the circumstances used by the police in obtaining Johnson's statement do not affect the admissibility of Garner's statement, and we determine that Johnson's statement was not admissible for the truth of the matter asserted.

Relying on *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), Garner contends that the refusal of the trial court to enter into evidence the tapes of Johnson's statements to the police violated his right to present a defense.

Johnson's taped statements constituted hearsay. See Neb. Rev. Stat. § 27-802 (Reissue 1995). The record indicates that the only applicable exception for which evidence or foundation was provided was the residual exception pursuant to Neb. Rev. Stat. § 27-803(22) (Reissue 1995).

Section 27-803 provides exceptions to the rule prohibiting hearsay under which the availability of the declarant is immaterial. Section 27-803(22), now found at § 27-803(23) (Supp. 1999), provides in part an exception:

> A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (a) the statement is offered as evidence of a material fact, (b) the statement is more probative on the point for which it is offered than any other evidence which the proponent can

procure through reasonable efforts, and (c) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

 The residual hearsay exception is to be used rarely and only in exceptional circumstances. *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990). An appellate court will affirm a trial court's ruling on whether evidence is admissible under the residual hearsay exception unless the trial court has abused its discretion. *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998).

 In *Chambers v. Mississippi, supra*, the U.S. Supreme Court stated that few rights are more fundamental than that of an accused to present witnesses in his defense. The Court further determined that in cases where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice. *Id*. However, such statements must be offered under circumstances that provide considerable assurance of their reliability. *Lilly v. Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999). See *Chambers v. Mississippi, supra*.

We conclude that the trial court did not abuse its discretion in refusing to play the tapes of Johnson's statements under the residual hearsay exception and that the refusal to admit the statement as evidence that Johnson committed the crime did not preclude Garner from presenting a defense. Johnson was present at trial and testified. Thus, Garner was able to present testimony from Johnson himself regarding police interview techniques and the statement Johnson made incriminating himself in Leu's death. As Johnson testified at trial, and as reflected by the tapes of his statement, Johnson made up the incriminating statement because he wanted to go home. The record reflects that Johnson was distressed at the time the statement was made. In addition, the details of the crime available throughout the record strongly show that Johnson's statement was false and thus was not reliable. The circumstances Johnson briefly admitted to do not at all match the evidence found at the crime scene. Under these circumstances, there were not considerable assurances of reliability. Thus, the trial court was correct in limiting the purpose for which evidence of Johnson's statement could be used.

## CONCLUSION

The trial court was not clearly wrong in determining that Garner's confession was voluntary. Although the trial court should have given Garner's requested jury instruction regarding the voluntariness of his confession, he has not shown that he was prejudiced by the failure of the trial court to do so. Finally, the trial court did not err in refusing to admit statements that Johnson made to police for the truth of the matter asserted in those statements. Finding no error, the order of the district court is affirmed.

AFFIRMED.