STATE OF NEBRASKA, APPELLEE, V.
KELVIN L. THOMAS, APPELLANT.
673 N.W.2d 897

Filed January 30, 2004.   No. S-02-1302.

Thomas C. Riley, Douglas County Public Defender, and Cheryl M. Kessell for appellant.

Jon Bruning, Attorney General, J. Kirk Brown, and Kimberly A. Klein for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

Kelvin L. Thomas appeals a district court order sentencing him for first degree murder, use of a deadly weapon to commit a felony, and being a felon in possession of a firearm. Thomas argues that (1) statements to the police were not voluntarily made because investigators indicated that he would receive a lower sentence if he told them the murder was not premeditated, (2) the statements should have been suppressed because he invoked his *Miranda* rights, and (3) the district court erred when it failed to suppress evidence because the application for a search warrant omitted facts affecting probable cause. We determine that the district court was not clearly erroneous in its conclusions. Accordingly, we affirm.

## BACKGROUND

On November 30, 2001, Terrence Quinn, an employee of Victory Auto Sales in Omaha, was found lying on the office floor, bleeding. Quinn later died, and an autopsy revealed the cause of death as gunshot wounds to the head. Quinn also had a laceration on his forehead.

On December 2, 2001, John L. Williams called Crimestoppers with information about the death and agreed to come to the police station. Williams told the police that Thomas, a black male, had told Williams that he had robbed a person at the location of Victory Auto Sales and had a lot of money. Williams reported that Thomas had purchased a white 1978 Oldsmobile 98 for $1,500 and stereo equipment valued at $2,000 to $3,000. He also purchased a cellular telephone and new eyeglasses. According to Williams, Thomas did not have a job and, only 2 days before, could not afford a pack of cigarettes. Williams identified Thomas from a photographic lineup.

Williams stated that while in the car with Thomas on December 1, 2001, Thomas showed him a .22-caliber gun and stated that he needed to get rid of it and would either give it to

Thomas' cousin or dispose of it in a park. The two stopped at the cousin's apartment and then left. After the stop at the apartment, Thomas told Williams that he had robbed and shot a man at a car dealership. Thomas stated that the man rushed him, that he struck the man with the gun, that the man kept coming, and that he eventually fired an unknown number of shots at the man. Williams also stated that Thomas often wore a black leather coat with a hood and black jeans.

Employees of Stereo West verified that on December 1, 2001, a man meeting Thomas' description who drove an older white Oldsmobile, with no plates, purchased stereo equipment for $2,294.29. The man used the name "Jamine Parker," wore a black coat with a hood, and told the employees that he had just bought the car. The employees were unable to positively identify Thomas from a photographic lineup.

Because of the information from Williams and the employees at Stereo West, a police investigator obtained a search warrant. The affidavit for the search warrant, however, failed to mention that employees at the store were unable to positively identify Thomas in a photographic lineup. The affidavit also failed to disclose that Williams was a convicted felon for theft by deception. After a search of Thomas' residence, officers seized items indicating that Thomas had made the purchases reported by Williams.

Thomas was arrested and taken to police headquarters for questioning by officers Donald Ficenec and Kevan Barbour. He was advised of his *Miranda* rights and agreed to make a videotape-recorded statement. Thomas initially denied involvement in the robbery and stated that he earned money by selling drugs and shooting dice. For the first 30 to 45 minutes, the police officers focused on minimizing Thomas' culpability by informing Thomas that sometimes a robbery could go bad and that sometimes the victim behaves "really stupid," rushes the robber, and then gets hurt.

The officers confronted Thomas with the evidence against him. The officers then focused on convincing Thomas that they understood how the death was unintentional and stressed that it was likely Quinn's fault because he rushed Thomas. In exhorting Thomas to tell the truth, the officers repeatedly stated that they could tell Thomas did not mean to kill Quinn and was not a "hard and cold criminal." Appealing to Thomas' good-heartedness, the

officers pointed out evidence that Thomas had given his girl friend money and had bought her baby a coat. They further stressed that if the death was an accident, Thomas needed to tell his side of the story or people would think he was a "frickin' animal" and "hardened core criminal."

The following colloquy then occurred:

[Thomas]: I didn't hurt nobody now man.

[Barbour]: Yeah – yeah, you did. And I gotta . . . .

[Thomas]: I'm done talkin' man, I know what I did, how can ya'll keep on sayin I did it.

[Ficenec]: You know what it's gonna sound like – what it's gonna look like? You know what premeditated murder is?

[Thomas]: No.

[Ficenec]: Okay, that's when you make up your mind ahead of time – I'm gonna go kill that man and then take his money – okay – that's called first degree premeditated murder, okay – every time somebody gets killed, it ain't all the same, every circumstance is different. The worst circumstance is premeditated, when you decide ahead of time "That's wh[at] I'm gonna go do, I'm gonna go kill him and take his money," okay – that's a whole lot different than "I'm just gonna take his money and I ain't gonna hurt nobody" and shit goes to hell on you without – because of things that are beyond your control, okay?

[Thomas]: But that's first degree. You can get life though – can ya?

[Ficenec]: The only two people – for premeditated murder, yes you can . . . but the only two people that know exactly how it went down inside there – and whether it was premeditated or not is you and him and he sure as hell can't tell us. You're the only one left, cause we can tell you what – we can tell you who did it, cause we've got all the evidence in the world to prove it. We can't crawl into your head – and we can't tell you exactly how, what you were thinkin' – when this went down, or the exact way it went down, whether or not this was – you just went in there bam bam, now take his money or if you went in there and said "Hey man, be cool, just give me the money" and this guy

freaked out on ya, okay – there's a big difference. One circumstance is you goin' in there because you're just a cold blooded heartless bastard and you're ready to get rid of anybody that stands in your way. The other is – you know, "all I want to do is just get me enough money to get me somewhere where I can stay, where it's warm, where it's got heat, and where I ain't stayin' in this house with no heat in the middle of winter, I'm just trying to get myself an old five hundred dollar car so I can get around, you know, get myself another job so I don't have to be doin' this shit anymore", who knows – okay. But there's a big difference between somebody that intentionally went in there to hurt somebody and somebody that didn't and things just went to shit on 'em.

[Thomas]: But either way, right now, I lose either way –

[Barbour]: Well, I . . . you . . . we must . . . it . . . it ain't all the same . . .

[Thomas]: It's wrecking my life, my life is gone now. I'm tried with some, some bullshit.

After this dialog, the officers returned to the theme that Thomas did not intend to kill anyone, and Thomas repeated that his life was gone. Ficenec then stated:

What's not bullshit is there's a big frickin' difference between goin' in there ahead of time with a plan that 'I'm gonna kill that man and take his money', and goin' in there with, you know, 'I'm doin' this because I need the money, but I'm scared, I'm nervous, I hope everything goes all right and . . . and that he just gives me money and I can get out of there and I don't want to hurt nobody', and the guy tries to be a hero and freaks out on ya. [W]hat anybody, for any crime that goes to court, okay, one thing they look at is what was their intent, okay? There's a big difference between somebody that intentionally hurt somebody and somebody who doesn't. Just think about when you were a kid, okay? If you broke something of your mom's. All right if you did it because you were just kinda horsin' around and, you know, accidentaly [sic] knock over something and break it . . . yeah, she gets a little mad, but it'd be a hell of a lot worse if you purposely went and broke something, you know what I

mean? . . . There's a difference between those people that do it intentionally to hurt you and those people that don't mean to, that's just the way things turned out.

. . . .

[Ficenec]: You for . . . forgive one, you don't the other.

After these statements, Barbour asked what Thomas would do if he caught two employees stealing and one employee explained his need for money and was remorseful while the other denied it all and made up a silly excuse. Specifically, Barbour asked which employee Thomas would keep, and Thomas replied that he would keep the person who told the truth. The officers then returned for several minutes to the theme that Thomas had a "good heart" and did not mean for the shooting to occur.

Barbour then asked Thomas to "show me your heart" and stressed that Thomas did not want people to think he was a hardened core criminal. Shortly after, Thomas stated, "He tried to rush me" and "I got scared and I just started shooting." The following colloquy then occurred:

[Thomas]: [sobbing] Now my fuckin' life is gone.

[Barbour]: Well, I don't know if your life is gone.

[Thomas]: My life is gone. I'm 23, I ain't got shit now. By the time I get out probably . . . I be like 50, 60 years old. My life is gone . . . probably get life, probably.

[Barbour]: I don't know what you're going to get. All I know is, is that I know that you . . . I knew when you sat down there you had a heart, Kelvin, and I know that you didn't mean it to go like that. . . . Explain to me what happened.

Thomas then confessed the details of the robbery and shooting. After Thomas provided the details of the crime, Thomas, while crying, stated, "I'm not worried about the time . . . cause it's too late now I'm just hurt right now. It been hurting every [sic] since Friday. This is how, exactly how I've been feelin' but I ain't been showin' nobody."

Thomas moved to suppress his statements and the items recovered in the search. At the hearing on the motion, Ficenec testified that he is an attorney and is aware that felony murder carries the same penalty as first degree premeditated murder. The district court overruled the motions, finding: (1) The affidavit for

the search warrant did not include deliberately false statements; (2) Thomas did not invoke his right to remain silent when he stated that he was finished talking; and (3) the officers did not discuss possible charges, deals, or bargains that might be made if Thomas cooperated.

Thomas waived his right to a jury, and trial was held on stipulated facts, with Thomas objecting to the admissibility of the evidence obtained under the search warrant and during his interview. The court found Thomas guilty of first degree murder, use of a firearm to commit a felony, and being a felon in possession of a firearm. Thomas was sentenced to life imprisonment for first degree murder, 10 to 15 years' imprisonment for use of a firearm to commit a felony, and 5 to 10 years' imprisonment for being a felon in possession of a firearm.

## ASSIGNMENTS OF ERROR

Thomas assigns, rephrased, that the district court erred by overruling his motions to suppress because (1) his statements were not voluntarily made, (2) his statements were obtained after he invoked his right to remain silent, and (3) evidence was collected under a search warrant issued without probable cause and which was based on material omissions in the affidavit.

## STANDARD OF REVIEW

■ A district court's finding and determination that a defendant's statement was voluntarily made will not be set aside on appeal unless this determination is clearly erroneous. *State v. Garner*, 260 Neb. 41, 614 N.W.2d 319 (2000).

■ A trial court's ruling on a motion to suppress, based on a claim of insufficiency of the affidavit supporting issuance of a search warrant, will be upheld unless its findings are clearly erroneous. In making this determination, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. See *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003).

■ The magistrate who is evaluating the probable cause question must make a practical, commonsense decision whether, given the totality of the circumstances set forth in the affidavit before him or her, including the veracity of and basis

of knowledge of the persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. The question is whether the issuing magistrate had a "substantial basis" for finding that the affidavit established probable cause. *State v. March*, 265 Neb. 447, 457, 658 N.W.2d 20, 29 (2003).

## ANALYSIS

### VOLUNTARY CONFESSION

Thomas argues that his statements were not voluntarily made because they were obtained by a promise of leniency. Thomas specifically argues that the police investigators' comments about the sentence for premeditated murder, when felony murder would carry the same sentence, was an improper promise of leniency that overbore his will and resulted in his statement.

The Due Process Clause of U.S. Const. amend. XIV and the due process clause of Neb. Const. art. I, § 3, preclude admissibility of an involuntary confession. *State v. Garner, supra.* The State has the burden to prove that a defendant's statement was voluntary and not coerced. *Id.* In making this determination, a totality of the circumstances test is applied, and the determination reached by the trial court will not be disturbed on appeal unless clearly wrong. *Id.*

While the circumstances surrounding the making of the statement and the characteristics of the individual defendant at the time of the statement are potentially material considerations, coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the 14th Amendment. *Colorado v. Connelly*, 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986); *State v. Garner, supra.* Thus, the inquiry is whether the trial court was clearly wrong in finding that police conduct, in the context of the totality of the circumstances, did not render the accused's confession involuntary. *State v. Garner, supra.*

The confession of an accused may be involuntary and inadmissible if obtained in exchange for a promise of leniency. *Id.*; *State v. Martin*, 243 Neb. 368, 500 N.W.2d 512 (1993); *State v. Porter*, 235 Neb. 476, 455 N.W.2d 787 (1990), *disapproved on other grounds, State v. Messersmith*, 238 Neb. 924, 473 N.W.2d

83 (1991). However, mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or promise, does not make a subsequent confession involuntary. *State v. Garner*, 260 Neb. 41, 614 N.W.2d 319 (2000). In addition, an improper promise of leniency will not render a confession involuntary unless it overcomes the defendant's free will and impairs his or her capacity for self-determination. *Smith v. Bowersox*, 311 F.3d 915 (8th Cir. 2002).

In *Smith v. Bowersox*, 311 F.3d at 917, a police detective in Missouri told an accused that he would not " 'get the chair' " because " 'they don't do that in this state,' " and the accused later confessed. Although the statement was technically correct because Missouri uses lethal injection instead of an electric chair, the Eighth Circuit determined that the statement was an improper, deceptive promise of leniency. The Eighth Circuit also determined, however, that the deceptive promise of leniency would not by itself render the confession involuntary. Noting that the investigator later backed away from the statement, the court determined that when all the circumstances were considered, the confession was voluntary.

Here, without specifically stating so, the investigators incorrectly indicated that premeditated murder would receive a greater sentence than felony murder. But a deceptive statement about possible sentences is only one of several factors to be considered. See *Smith v. Bowersox, supra.* After discussing premeditated murder, the officers returned to the theme that Thomas was a "good person" instead of a "hardened core criminal" and repeated the evidence against him. Several minutes after the discussion of premeditated murder, Thomas stated, "He tried to rush me" and "I got scared and I just started shooting." Thomas then stated that his life was over and that he would probably get a life sentence. An investigator responded that he did not know what sentence Thomas would get, after which Thomas provided specific details of the shooting.

We do not ignore the investigators' incorrect statements to Thomas that premeditated murder is "worse" than felony murder. Although the investigators did not make specific promises, the comments incorrectly presented the idea that premeditated

murder would receive a greater sentence than felony murder. But the record does not show that Thomas' confession was caused by misinformation about possible sentences. Instead, Thomas gave in to the general theme that he was not an "animal" or "hardened core criminal." This conclusion is supported by several factors: (1) Between the discussion of premeditated murder and Thomas' confession, the investigators returned to their previous themes without specifically discussing penalties; (2) both before and after his confession, Thomas indicated a knowledge that he could get a life sentence for the crime; and (3) Thomas provided the specific details after an investigator told him that they did not know what sentence he would get. This conclusion is further supported, because after providing details of the crime, Thomas, while crying, stated, "I'm not worried about the time . . . cause it's too late now I'm just hurt right now. It been hurting every [sic] since Friday. This is how, exactly how I've been feelin' but I ain't been showin' nobody." Thus, Thomas indicated that a general remorse about the crime was the primary reason for his confession.

The record supports the conclusion that the primary reason for Thomas' confession was a general concern that he should do the right thing to show that he was not a "hardened core criminal," as the investigators had suggested. Under the totality of the circumstances, and after viewing the videotape, we conclude that the references to premeditated murder did not overbear Thomas' will to cause the confession. We conclude that the district court's determination that Thomas' confession was voluntary was not clearly wrong.

### INVOCATION OF RIGHT TO REMAIN SILENT

Thomas next argues that his confession should have been suppressed because it was made after he invoked his *Miranda* rights and the investigators continued questioning him.

To safeguard an uncounseled individual's Fifth Amendment privilege against self-incrimination, suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation. *State*

*v. Dallmann,* 260 Neb. 937, 621 N.W.2d 86 (2000). Once an accused invokes his or her constitutional rights to remain silent and to the services of an attorney, the authorities must refrain from initiating further conversations and must scrupulously honor the accused's request. *State v. Mata,* 266 Neb. 668, 668 N.W.2d 448 (2003). But the police are not required to accept as conclusive any statement or act, no matter how ambiguous, as a sign that a suspect desires to cut off questioning. *Id.* Resolution of ambiguity in the invocation of the constitutional right to remain silent is a question of fact. *Id.*

The district court's determination about invocation of the right to remain silent was not clearly erroneous. Thomas never clearly sought to invoke his right to remain silent. Instead, he interrupted an accusation that he had committed the crime by stating, "I'm done talkin' man, I know what I did, how can ya'll keep on saying I did it." After this, Thomas continued to converse with the officers. Thomas' single statement that he was done talking could be interpreted as a response in frustration to the investigators' unwillingness to believe that he was not involved in the crime instead of a clear invocation of his right to remain silent. Thomas also followed the statement by a question requesting further information, which also acted to encourage further dialog. This single statement was not a clearly stated intent to end the interview. Had he wanted to terminate the interview, he could have made his wishes clear. See, generally, *State v. Mata, supra.* We conclude that the district court's determination that Thomas did not invoke his right to remain silent is not clearly erroneous.

PROBABLE CAUSE FOR SEARCH WARRANT

Thomas contends that the search warrant lacked probable cause because it failed to establish Williams' credibility and omitted material information about him. In particular, he argues that (1) Williams' reliability was not established, (2) the officer failed to identify Williams as a convicted felon, (3) the officer failed to state that the Crimestoppers program pays money to informants, and (4) the affidavit failed to state that Stereo West employees were unable to identify Thomas in a photographic lineup.

We first note that Thomas relies on cases involving confidential informants. We have said that to credit a confidential

source's information in making a probable cause determination, the affidavit should support an inference that the source was trustworthy and that the source's accusation of criminal activity was made because of information obtained in a reliable manner. *State v. Utterback*, 240 Neb. 981, 485 N.W.2d 760 (1992), *disapproved in part on other grounds, State v. Johnson*, 256 Neb. 133, 589 N.W.2d 108 (1999). We have also said that among the ways reliability of an informant may be established are by showing in the affidavit to obtain a search warrant that (1) the informant has given reliable information to police in the past, (2) the informant is a citizen informant, (3) the informant has made a statement that is against his or her penal interest, and (4) a police officer's independent investigation establishes the informant's reliability or the reliability of the information the informant has given. *Id.*

Here, however, Williams was not a confidential informant. He provided his name, he met with police officers, and his name was listed in the affidavit for the search warrant. We have noted that by identifying himself or herself by name, the informant is put in the position to be held accountable for providing a false report, which makes the informant more reliable. See *State v. Ege*, 227 Neb. 824, 420 N.W.2d 305 (1988). Further, Williams' statements were corroborated. The police went to Stereo West and confirmed that a person matching Thomas' description and clothing, and driving a similar car, had purchased a large amount of stereo equipment the day after the murder. We disagree with Thomas' argument that the affidavit lacked probable cause because Williams' reliability was not established.

Thomas next argues that the affidavit omitted material information that (1) Williams was convicted of felony theft by deception, (2) the Crimestoppers program pays money to informants, and (3) Stereo West employees were unable to identify Thomas in a photographic lineup.

We have said that omissions in an affidavit used to obtain a search warrant are considered to be misleading when the facts contained in the omitted material tend to weaken or damage the inferences which can logically be drawn from the facts as stated in the affidavit. *State v. Utterback, supra.* However, a defendant who seeks to suppress evidence obtained under a search warrant has the burden of establishing that the search warrant is

invalid so that evidence secured thereby may be suppressed. *State v. Morrison*, 243 Neb. 469, 500 N.W.2d 547 (1993), *disapproved in part on other grounds, State v. Johnson, supra.* The role of an appellate court is to determine whether the affidavit used to obtain a search warrant, if it contained the omitted information, would still provide a magistrate or judge with a substantial basis for concluding that probable cause existed for the issuance of the warrant. *Id.* If a substantial basis for probable cause would still exist, Thomas' arguments fails.

Here, the district court's finding that there would still be probable cause if the omitted material was included in the affidavit was not clearly erroneous. Specific information about the Crimestoppers program and Williams' past arrest affects Williams' reliability. As previously stated, Williams' reliability was established because he met with police, his name was provided, and the information was corroborated. Although employees at Stereo West were unable to pick Thomas out of a photographic lineup, this information, had it been included, would not vitiate probable cause in the light of the other corroborating evidence. We conclude that the district court's determinations were not clearly erroneous and that had the omitted material been included, the issuing magistrate would have had a substantial basis for concluding that probable cause existed for the issuance of the warrant.

## CONCLUSION

We conclude that the district court was not clearly erroneous in determining that Thomas' confession was voluntary and that he did not invoke his right to remain silent. We further conclude that the court was not clearly erroneous in determining that the search warrant was based on probable cause and should not be suppressed. Accordingly, we affirm.

AFFIRMED.