State of Nebraska, appellee, v. Endre B. Turner,
also known as Andre B. Turner, appellant.

___ N.W.2d ___

Filed May 30, 2014.    No. S-13-846.

1. **Motions to Suppress: Confessions: Constitutional Law: Appeal and Error.** In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, an appellate court applies a two-part standard of review. With regard to historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.

2. **Appeal and Error.** An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.

3. **Confessions: Due Process.** The Due Process Clause of U.S. Const. amend. XIV and the due process clause of Neb. Const. art. I, § 3, preclude admissibility of an involuntary confession.

4. **Confessions.** Whether a confession or statement was voluntary depends on the totality of the circumstances.

5. **Confessions: Police Officers and Sheriffs: Due Process.** Coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the 14th Amendment.

6. **Confessions: Proof.** The State has the burden to prove that a defendant's statement was voluntary and not coerced.

7. **Confessions**. A defendant's confession may be involuntary and inadmissible if obtained in exchange for a promise of leniency.

8. \_\_\_\_. An improper promise of leniency will not render a confession involuntary unless it overcomes the defendant's free will and impairs his or her capacity for self-determination.

Appeal from the District Court for Douglas County: James T. Gleason, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Douglas A. Johnson, and Ryan Locke, Senior Certified Law Student, for appellant.

Jon Bruning, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Cassel, J.

## INTRODUCTION

Endre B. Turner appeals from his convictions for first degree murder, use of a deadly weapon to commit a felony, and possession of a weapon by a prohibited person. The charges against Turner arose from the shooting of Richard Harrison during the burglary of Harrison's home. Turner argues that his confession to the shooting and burglary was involuntary because it was the product of threats, coercion, and inducements of leniency made by police officers. We find no merit to this argument. Although officers misrepresented that felony murder would receive a lesser sentence than premeditated murder, after reviewing the totality of the circumstances surrounding the confession, we conclude that the misinformation regarding possible sentences did not overcome Turner's will and cause him to confess. We therefore affirm his convictions and sentences.

## BACKGROUND

On September 29, 2011, Harrison's mother returned home from work and found Harrison lying on the floor of his bedroom. She could not find a pulse and noticed blood in his bedroom closet, where his head and upper body were lying. She called the 911 emergency dispatch center, and paramedics pronounced Harrison dead when they arrived at the scene. The autopsy of Harrison's body revealed that he had been shot multiple times by a .22-caliber firearm with a right-hand twist.

Harrison's mother informed police officers that the television in Harrison's bedroom had been moved and that several of Harrison's possessions were missing. These missing possessions included a "PlayStation 3" video game system and an "HTC Evo" cell phone. Officers obtained the serial number of the missing PlayStation, and the police department's pawn unit began to monitor local pawnshops for a PlayStation with a matching serial number.

Following up on a comment posted to an online article regarding Harrison's death, officers made contact with a witness who saw a man running from Harrison's home on the

afternoon of the shooting and burglary. Brian Jones was driving eastward on Grand Avenue in Omaha, Nebraska, at approximately 3 or 4 p.m. As he approached the top of a hill, he saw a man "coming up running off the front porch or front step" of Harrison's home. The man "hit the ground" and then stopped and looked in Jones' direction. Jones described that the man was black, had a light complexion, was about 6 feet tall with a medium build, and had a tattoo on the side of his neck.

The police department's pawn unit then matched the serial number of Harrison's PlayStation to a PlayStation that had been pawned on October 24, 2011. Officers obtained the pawned PlayStation, the pawn card, and surveillance footage showing the individuals who had pawned the PlayStation. The pawn card established that the PlayStation had been pawned by Jasmine Coleman. However, the pawnshop's surveillance footage showed that Coleman had been accompanied by a black male with a light complexion.

The pawned PlayStation was tested for fingerprints, and a match was returned. The fingerprints were identified as belonging to Turner, and Turner's parole officer confirmed that Turner was the black male accompanying Coleman on the pawnshop's surveillance footage. Jones, the witness who saw a man running from Harrison's home on the day of the shooting and burglary, identified Turner as the man he saw in a photographic lineup and at trial.

Officers learned that Turner was scheduled to meet with his parole officer on November 9, 2011, and so decided to interview him at the parole office on that day and to simultaneously execute a search warrant for his residence. Upon execution of the warrant, officers were informed that Turner and Coleman resided in the basement of the residence. In a basement bedroom, officers discovered a .22-caliber revolver in a backpack in the bedroom closet and a charger for an HTC Evo cell phone on a nightstand. Testing of the revolver confirmed that it had a right-hand twist.

Turner's interview at the parole office was conducted by Sgt. Donald Ficenec and Det. Daryl Krause of the Omaha Police Department. Turner was advised of his *Miranda* rights,

and he agreed to speak with the officers. The officers first questioned Turner on where he had obtained the PlayStation that he and Coleman pawned on October 24, 2011. But Turner denied any involvement in the burglary of Harrison's home or in Harrison's death. Ficenec then advised him that a .22-caliber revolver had been found in his home and claimed that ballistics testing would confirm that the revolver had fired the bullets recovered from Harrison's body.

The officers next attempted to ascertain how the shooting occurred, informing Turner that they knew what happened and who did it, but not "how it all went down and why." In order to obtain this information, the officers represented that "[i]t makes a difference" how the shooting occurred:

> Ficenec: It makes a difference if you go and break into somebody's house because you got a personal revenge against this guy. Let's say that this guy you found out had, I don't want to say something that's—I don't mean to offend you—let's say that this guy, you had found out that this guy had an affair with [Coleman]. So you were pissed off at him, so you were going to go over there and you were going to go get him because of that, okay. That's one thing. All you're trying to do, you got out of jail, you don't have much money, you're trying to get started again with the jobs and stuff—it takes a while to get some paychecks and get some money set aside. So you revert back to your old M.O.—your old habits. Maybe you're only going to do this for a little while until you get back on your feet, who knows? But you go in, you get surprised. You don't want to hurt anybody, you don't intend to hurt anybody. But you go in there, you get surprised, you just got out of jail, you're trying to start all over. What I'm saying is, you can see how that's a big difference between something like that, and something like I said if we find out that maybe he knew [Coleman]. Maybe he had had some phone—some contacts with [Coleman], you know. There would be a big difference between the one case and the other, right? What I'm saying is, I can't crawl into your head. So I don't know exactly—cause I wasn't there—I can prove

who did it. I can collect all the evidence, like the DNA evidence at the house to show that you were in the house. I can prove—you know—do the ballistics testing to show that that's the gun.

Turner: (indiscernible)

Ficenec: I can get the evidence to prove it, alright—

Turner: But how?

Ficenec: But what I'm saying is—what I'm saying is—if I wasn't there, I can't tell you exactly how it went down. And that makes a big difference.

The officers then focused on convincing Turner that they knew the shooting was unintentional and that Turner was not an evil person. They confronted Turner with various lies he had told them, claiming that the lies made him look like a bad, evil person. But Turner continued to maintain his innocence. However, after the officers discovered the presence of Harrison's HTC Evo cell phone on Turner's person, they returned to their previous theme that it would make a difference whether the shooting was accidental or premeditated—indicating that Turner would receive a lesser sentence if the shooting had not been planned:

Turner: Man, I'm going to get life for this shit.

Krause: No, you're not.

Turner: (Indiscernible) thousand, I'm going to get a hundred years.

Ficenec: I'm going to tell you this. I can't tell you what the potential penalty could be. I mean I'm not going to bullshit you. Could you potentially get life? Is that a possibility? I mean, I'm not a judge, I'm not a prosecutor.

Turner: Yeah.

Ficenec: So what I'm saying is, it could be a possibility. That's why I'm trying to tell you, it's such a big difference how and why this happened . . . .

. . . .

Ficenec: To illustrate it if, "All I'm trying to do is go in there and take his PlayStation I don't want any trouble. I don't want to hurt anybody. I just want to go in there and take his PlayStation when things go bad and

I get surprised and I react and I make a mistake." That's one thing. It's another thing that, "I knew this person. I had a grudge against this person. I didn't like this person. I went in there because I wanted this person dead." I mean, that's what I'm saying. It's two hugely different circumstances even though it's the same result in the end. And when you go to court, when it comes time for a judge—we've got all the evidence to prove it. We've been laying a lot of it out there for you. Well, when you go to court and it comes time for a judge to decide, "Is this a case where somebody deserves life in jail?" that's going to be part of the consideration. . . . I'm not trying to put words in your mouth, but that's just why it makes sense to me that this probably was a situation where you didn't intend to hurt anybody, you didn't want to hurt anybody, where like I said, you got surprised, things went bad, and you got scared. So that's all—that's what I'm saying. There's a big difference, okay? You can have the same charge that one person gets life for and then another person gets ten years for.

Krause: Or 1 to 10. What he's basically saying, to sum it up in layman's terms, because we do a lot of the legal jargon, you may not, sometimes things are accidents, sometimes things are not. You hate him, you didn't like what he was doing, not an accident. Going in, trying to get a PlayStation, "Oh, fuck," accident. Those are different. The end result is the same, what led up to it is different. That's what people look at.

After this exchange, the officers again emphasized that Turner did not want to look like an evil person, and they exhorted him to "do the right thing":

Krause: Help me explain it, okay? You have to think what's good now. I mean, what's your mom and dad going to think? They're going to think you're evil and you tried to do this? You know what I'm saying, man?

Turner: (indiscernible)

Krause: That's not—you're getting worked up, Bud. Don't do that.

Turner: I don't know, man.

Krause: Then do the right thing now.

Turner: I might be in jail for a long-ass time.

Krause: You might not. Don't think about that. I don't know, okay? I'm with you right here. I don't know the circumstances that's going to happen, but I do know that you want to tell me, I can see it, because you know what happened was wrong and you're not a bad person. You believe in God, right?

. . . .

Krause: This is your soul you're talking about. If you know you didn't mean to do it, then just tell me.

Turner: I didn't.

Krause: Then explain the circumstances and help me explain and show everybody that this is not what happened. Help me because I'm the only one . . . that can help you explain and back up what you're laying out how this—that you didn't meant to do this, because right now it looks like you meant to do it by lying to me and—

Turner: But I didn't though.

. . . .

Turner: It was just, like—fuck it, man, it was spur of the moment.

Turner then confessed the details of the shooting and burglary. He was taken to the police department, where officers interviewed him for several more hours. While Turner was in the interview room at the police department, officers permitted Coleman to enter and speak with him. Turner stated to Coleman, "I'm about to get like, life."

Turner was charged with first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. Before trial, Turner moved to suppress on multiple grounds any and all statements made by him to police officers, including that the statements were involuntary. The district court conducted a hearing on Turner's motion and found that "his in[-]custodial interrogation did not produce any statements as a result of any force, any threat of force or any promises of any kind." It therefore overruled his motion. Turner renewed his objection at trial, and it was again overruled.

The jury returned a verdict finding Turner guilty on all charges. He was sentenced to life imprisonment on the murder conviction, a minimum and maximum term of 40 years' imprisonment on the use of a deadly weapon conviction, and a minimum and maximum term of 3 years' imprisonment on the possession of a deadly weapon conviction. Turner timely appeals.

## ASSIGNMENTS OF ERROR

Turner assigns that the district court erred in overruling his motion to suppress and in admitting his confession into evidence at trial, because his confession was the product of threats, coercion, and inducements of leniency made by police officers.

## STANDARD OF REVIEW

[1] In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, an appellate court applies a two-part standard of review. With regard to historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.[1]

## ANALYSIS

[2] Turner assigns that his confession to the shooting and burglary was involuntary because it was the product of threats, coercion, and inducements of leniency made by police officers. However, the argument in his brief on appeal focuses solely on his assertion that his confession was induced by promises of leniency. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.[2] We therefore limit our review to whether Turner's confession was involuntary as the product of promises of leniency.

---

[1] *State v. Landis*, 281 Neb. 139, 794 N.W.2d 151 (2011).

[2] *State v. Eagle Bull*, 285 Neb. 369, 827 N.W.2d 466 (2013).

[3-6] We first recall governing principles of law pertaining to the admissibility of a confession. The Due Process Clause of U.S. Const. amend. XIV and the due process clause of Neb. Const. art. I, § 3, preclude admissibility of an involuntary confession.[3] Whether a confession or statement was voluntary depends on the totality of the circumstances.[4] Coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the 14th Amendment.[5] The State has the burden to prove that a defendant's statement was voluntary and not coerced.[6]

Turner argues that his confession was involuntary because it was induced by an implied promise that he would receive a lesser sentence if he confessed that the shooting was accidental. As evidence of this implied promise, he points to Ficenec's statements that it made "a big difference" how and why the shooting occurred and to Krause's statement that the possible penalty could be 1 to 10 years' imprisonment if the shooting was accidental. He claims that these statements constituted an implied promise of leniency which overcame his will and caused him to confess. He further argues that the officers' statements were deceptive because first degree murder encompasses felony murder—which does not require a showing of malice, intent, or premeditation.

Turner is correct in his assertion that the officers deceived him during the course of the interview at the parole office. Ficenec's statements as to there being "a big difference" how and why the shooting occurred, and specifically Krause's statement that Turner could get 1 to 10 years' imprisonment if the shooting was accidental, incorrectly indicated that felony murder would receive a lesser sentence than premeditated murder. These statements were deceptive because both felony

---

[3] *State v. Thomas*, 267 Neb. 339, 673 N.W.2d 897 (2004), *abrogated on other grounds*, *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009).

[4] *State v. Ray*, 266 Neb. 659, 668 N.W.2d 52 (2003).

[5] *Landis, supra* note 1.

[6] *Thomas, supra* note 3.

murder and premeditated murder constitute murder in the first degree,[7] and both may be treated as either a Class I or Class IA felony,[8] punishable by death or life imprisonment.[9]

[7,8] But the fact that the officers deceived Turner during the course of the interview does not end our analysis. We have recognized that a defendant's confession may be involuntary and inadmissible if obtained in exchange for a promise of leniency.[10] However, an improper promise of leniency will not render a confession involuntary unless it overcomes the defendant's free will and impairs his or her capacity for self-determination.[11] Thus, whether the confession was voluntary in this case turns upon whether the misinformation regarding possible sentences overcame Turner's will and caused him to confess. And as noted above, our determination as to whether a confession was voluntary depends on the totality of the circumstances.

We have previously noted that a deceptive statement regarding possible sentences is only one of several factors to be considered.[12] In *State v. Thomas*,[13] we determined that the defendant's confession was voluntary and not caused by misinformation regarding possible sentences due to the presence of three factors. These factors included that (1) the officers returned to previous themes between the discussion of possible penalties and the defendant's confession, (2) the defendant indicated a knowledge that he could receive life imprisonment for the crime both before and after his confession, and (3) the confession occurred after an officer indicated that he did not know what sentence would be imposed.[14]

---

[7] See Neb. Rev. Stat. § 28-303 (Reissue 2008).

[8] See *id*.

[9] See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2012).

[10] *State v. Martin*, 243 Neb. 368, 500 N.W.2d 512 (1993).

[11] *Smith v. Bowersox*, 311 F.3d 915 (8th Cir. 2002); *Thomas, supra* note 3.

[12] See *Thomas, supra* note 3.

[13] *Id*.

[14] *Id*.

We find that *Thomas* controls our determination as to the voluntariness of the confession in this case. Each of the factors we identified in *Thomas* is present and leads us to the conclusion that the misinformation regarding possible sentences did not overcome Turner's will and cause him to confess. However, in relying upon the factors identified in *Thomas*, we must first note that our standard of review has since changed. In *Thomas*, we reviewed the district court's determination that the defendant voluntarily confessed for whether the court was clearly wrong.[15] As noted above, our current standard of review entails two parts: We review the trial court's findings of historical fact for clear error and independently decide whether those facts suffice to meet constitutional standards.[16] However, this change does not affect the applicability of the above factors to our analysis of the confession in this case.

As in *Thomas*, Turner's confession did not follow the discussion in which the officers misrepresented that a lesser sentence would be imposed for felony murder. Rather, his confession was immediately preceded by the officers' return to the prior theme of Turner not being a bad, evil person; Krause's exhortation to "do the right thing"; and the colloquy regarding Turner's belief in God and the fate of his soul. Thus, the dialog immediately preceding Turner's confession supports the conclusion that his confession was primarily motivated by remorse and a desire to do the right thing—not to receive a lesser sentence.

As to the second factor we identified in *Thomas*, Turner indicated both before and after his confession that he was aware he could receive a sentence of life imprisonment. Before Turner confessed at the parole office, he stated, "Man, I'm going to get life for this shit." And after he confessed and was transferred to the police department, Turner stated to Coleman, "I'm about to get like, life." Thus, this factor indicates that Turner did not believe his confession precluded him from receiving life imprisonment.

---

[15] See *id*.

[16] See *Landis, supra* note 1.

Finally, like the defendant in *Thomas*, Turner confessed after officers stated that they did not know what sentence would be imposed. In response to Turner's statement, "I'm going to get a hundred years," Ficenec replied, "I can't tell you what the potential penalty could be. I mean I'm not going to bullshit you. Could you potentially get life? Is that a possibility? I mean, I'm not a judge, I'm not a prosecutor." And during the colloquy immediately preceding Turner's confession, Krause stated, "I don't know, okay?" in response to Turner's assertion that he "might be in jail for a long-ass time." Thus, although they incorrectly indicated that felony murder would receive a lesser sentence, the officers made no representations as to what sentence Turner would receive if convicted. This factor supports the conclusion that Turner's confession was not motivated by a belief that he would receive a particular sentence.

Although not acknowledged in Turner's brief, at oral argument, he recognized the applicability of *Thomas* to this case. But he attempted to distinguish *Thomas* on the basis of the close proximity between the misinformation regarding possible sentences and his confession. Specifically, he claimed that he confessed only 39 seconds after Krause indicated that the possible penalty for felony murder could be 1 to 10 years' imprisonment.

We disagree that this case is distinguishable from *Thomas* on the basis that only 39 seconds separated Turner's confession from the misinformation regarding possible sentences. First, our opinion in *Thomas* makes no mention of the specific period of time that passed between the misinformation regarding possible sentences and the defendant's confession in that case. We noted only that the officers returned "for several minutes" to the previous theme of the defendant's being a good person before he confessed.[17] And Turner admitted at oral argument that he was unaware of how much time passed between the misinformation regarding possible sentences and the defendant's confession in *Thomas*.

---

[17] *Thomas, supra* note 3, 267 Neb. at 345, 673 N.W.2d at 904.

Second, we disagree that Turner's confession immediately followed Krause's statement that the penalty for felony murder could be 1 to 10 years' imprisonment. Although Turner followed Krause's statement by asking what could happen to him if he was to say that the shooting was accidental, he did not expressly confess to the shooting and burglary until approximately 3 minutes 35 seconds after Krause's statement. And as noted above, during this period immediately before his confession, the officers returned to the previous theme of Turner's not being a bad, evil person and exhorted him to do the right thing and to consider how he would be perceived. We therefore find Turner's argument that this case is distinguishable from *Thomas* to be unpersuasive.

We do not find this case to be distinguishable from *Thomas* in any relevant way. In both cases, officers misrepresented that felony murder would receive a lesser sentence than premeditated murder and used the same "big difference" language. However, in each case, the confession was immediately preceded by themes other than possible sentences, the defendant demonstrated knowledge that he could receive a life sentence before and after he confessed, and the confession followed statements by officers that they did not know what sentence would be imposed. Although we do not condone the deceptive tactics used by the officers in this case, the totality of the circumstances demonstrates that the misinformation regarding possible sentences did not overcome Turner's will and cause him to confess. We therefore find no merit to Turner's argument that his confession was involuntary, and so we affirm his convictions and sentences.

## CONCLUSION

Although Turner is correct in his assertion that police officers deceived him as to the potential penalty for felony murder, the totality of the circumstances shows that this misinformation did not overcome his will and cause him to confess. The dialog immediately preceding Turner's confession demonstrates that his primary motivation was remorse and a desire to do the right thing. Additionally, the officers denied any knowledge of the sentence Turner would receive, and Turner

indicated that he knew he could receive life imprisonment notwithstanding his confession. We therefore conclude that Turner's confession was voluntary and, thus, properly admissible at trial. We affirm his convictions and sentences.

Affirmed.