court with directions to sustain the motion to transfer to the tribal court.

## CONCLUSION

Because the State did not meet its burden of establishing good cause to deny transfer to tribal court, the juvenile court abused its discretion in denying Yolanda's motion to transfer. We reverse the order of the juvenile court and remand the cause with directions to sustain the motion to transfer.

Reversed and remanded with directions.

———————————

State of Nebraska, appellee, v.
Ronald L. Lantz, Sr., appellant.
___ N.W.2d ___

Filed January 21, 2014.    No. A-12-1012.

1. **Search Warrants: Affidavits: Probable Cause.** To be valid, a search warrant must be supported by an affidavit which establishes probable cause.
2. **Search Warrants: Probable Cause: Words and Phrases.** Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found.
3. **Search Warrants: Probable Cause: Proof.** Proof of probable cause justifying issuance of a search warrant generally must consist of facts so closely related to the time of issuance of the warrant as to justify a finding of probable cause at that time.
4. **Search and Seizure: Probable Cause.** Probable cause to search is determined by a standard of objective reasonableness, that is, whether known facts and circumstances are sufficient to warrant a person of reasonable prudence in a belief that contraband or evidence of a crime will be found.
5. **Search Warrants: Affidavits: Probable Cause: Appeal and Error.** In reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, an appellate court applies a "totality of the circumstances" rule whereby the question is whether, under the totality of the circumstances illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause.
6. **Search Warrants: Affidavits: Appeal and Error.** As a general rule, an appellate court is restricted to consideration of the information and circumstances found within the four corners of an affidavit in support of a search warrant.
7. **Probable Cause: Affidavits: Time.** There is no bright-line test for determining when information is stale. Whether the averments in an affidavit are sufficiently timely to establish probable cause depends on the particular circumstances of the case, and the vitality of probable cause cannot be quantified by simply

counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit. Time factors must be examined in the context of a specific case and the nature of the crime under investigation.

8. ____: ____: ____. Where the facts contained in an affidavit indicate an isolated violation of the law, it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time; however, where the facts contained in an affidavit indicate protracted and continuous criminal activity or, in other words, a course of conduct, the passage of time becomes less significant.

9. **Search Warrants: Affidavits.** Omissions in an affidavit used to obtain a search warrant are considered to be misleading when the facts contained in the omitted material tend to weaken or damage the inferences which can logically be drawn from the facts as stated in the affidavit.

10. **Search and Seizure: Search Warrants: Motions to Suppress: Proof.** A defendant who seeks to suppress evidence obtained under a search warrant has the burden of establishing that the search warrant is invalid so that evidence secured thereby may be suppressed.

11. **Search Warrants: Affidavits: Probable Cause: Courts: Appeal and Error.** The role of an appellate court is to determine whether the affidavit used to obtain a search warrant, if it contained the omitted information, would still provide a magistrate or judge with a substantial basis for concluding that probable cause existed for the issuance of the warrant. If a substantial basis for probable cause would still exist, then the defendant's argument fails.

12. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

13. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

14. **Trial: Jurors.** The issue of the retention of a juror after the commencement of trial is a matter of discretion for the trial court.

15. **Criminal Law: Jury Misconduct: Proof.** A criminal defendant claiming jury misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of jury misconduct and (2) that such misconduct was prejudicial to the extent that the defendant was denied a fair trial.

16. **Trial: Jurors: Presumptions: Proof.** The competency of a juror is generally presumed, and the burden is on the challenging party to establish otherwise.

17. **Juror Qualifications: Judges.** A trial judge is not required to excuse a juror when the juror is able to decide the case fairly and impartially.

18. **Juror Qualifications: Appeal and Error.** An appellate court defers to the trial court's decision whenever a juror is unequivocal that he or she can be fair or impartial. This rule applies both to the issue of whether a potential juror should be removed for cause prior to trial and to the situation of whether a juror should be removed after the trial has commenced.

19. **Appeal and Error.** An appellate court always reserves the right to note plain error which was not complained of at trial or on appeal.

20. ____. Consideration of plain error occurs at the discretion of an appellate court.

21. ____. Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.

22. **Statutes.** To the extent there is a conflict between two statutes, the specific statute controls over the general statute.

23. **Convictions: Sentences.** The sentence for any conviction carrying a mandatory minimum sentence must be ordered to be served consecutively.

24. ____: ____. Mandatory minimum sentences cannot be served concurrently. A defendant convicted of multiple counts each carrying a mandatory minimum sentence must serve the sentence on each count consecutively.

25. **Sentences: Time.** A sentence validly imposed takes effect from the time it is pronounced.

26. **Sentences.** When a valid sentence has been put into execution, the trial court cannot modify, amend, or revise it in any way, either during or after the term or session of court at which the sentence was imposed.

27. **Judgments: Records.** When there is a conflict between the record of a judgment and the verbatim record of the proceedings in open court, the latter prevails.

Appeal from the District Court for Jefferson County: Paul W. Korslund, Judge. Affirmed in part, and in part vacated and remanded for resentencing.

James R. Mowbray and Kelly S. Breen, of Nebraska Commission on Public Advocacy, for appellant.

Jon Bruning, Attorney General, and Stacy M. Foust for appellee.

Inbody, Chief Judge, and Irwin and Riedmann, Judges.

Inbody, Chief Judge.

## I. INTRODUCTION

Ronald L. Lantz, Sr., was convicted of three counts of first degree sexual assault of a child after a jury determined that he had digitally penetrated his 14-year-old stepdaughter and her friend during a sleepover. He has appealed these convictions, contending that the district court erred (1) in denying his motion to suppress, (2) in admitting evidence of prior sexual assaults, and (3) in failing to remove a juror who overtly demonstrated sympathy and bias.

## II. STATEMENT OF FACTS

### 1. Background

On the evening of January 10, 2011, 14-year-old best friends A.M. and M.C. had a sleepover at A.M.'s house. Also at A.M.'s home were A.M.'s mother; A.M.'s stepfather, Lantz; and A.M.'s younger brother and younger sister. At around 10 or 10:30 p.m., A.M., M.C., Lantz, and A.M.'s younger sister were in the living room and A.M. and M.C. began watching a "scary" movie. A.M.'s mother and younger brother were already asleep in other areas of the home.

During the movie, Lantz gave M.C. a neck and back massage. During the back massage, M.C. was lying on her stomach on a couch and Lantz was kneeling on the floor. Around the time that Lantz was in the middle of giving M.C. the back massage, A.M. was asleep. During the back massage, Lantz said to M.C., "[D]on't worry, I'm not going to do anything stupid." As M.C. began to drift off to sleep, she noticed that Lantz was starting to massage her lower calves and was working his way up her legs. When Lantz got to her lower back, he stuck his hands down her pants at her waistline along her back. Lantz' hands continued to go lower until he put a finger inside of M.C.'s vagina. M.C. could feel what was happening, but because she believed Lantz thought that she was sleeping, she acted like she was stretching and getting ready to wake up. At that point, M.C. felt Lantz pull his hand out of her pants and turn around quickly, and by the time that she sat up, Lantz was sitting on his bottom, not his knees, and was facing the television.

M.C. complained that she had a headache and asked Lantz to get her a washcloth and some Tylenol; when Lantz left to go to the kitchen, she moved from the couch to the recliner. After Lantz brought her the washcloth and Tylenol, he sat on the couch and put A.M.'s feet over his lap. M.C. observed Lantz' hand under a blanket that was covering A.M., and to M.C., he appeared to extend his hand up toward the area of A.M.'s crotch; M.C. could see the blanket moving. According to A.M., she fell asleep watching the movie and the next thing that she remembered was waking up to find that Lantz had

put his hand down the back of her sweatpants, underneath her underwear, and that his finger was in her vagina.

At about 7 a.m., A.M. got up and went upstairs to her room to get ready for school and checked her cellular telephone. There was a text message that M.C. had sent at 2:38 a.m., stating that she had something to talk to A.M. about. A.M. stated that her first thought was of Lantz and that she was scared and shocked and "didn't want to believe it at first." A.M. continued getting ready for school, and about 5 or 10 minutes later, M.C. came upstairs to A.M.'s room. M.C. told A.M. that Lantz had "fingered [M.C.]," and A.M. responded that it had been happening to A.M. for a while and that she was sorry it happened to M.C. M.C. asked A.M. why she had not said anything, and A.M. began crying and responded that she was scared. M.C. called her stepfather and told him what had happened. He responded that he was on his way to A.M.'s house.

After that telephone call, A.M. and M.C. told A.M.'s mother, who did not believe them. Shortly thereafter, A.M.'s grandmother arrived to take the girls to school, so A.M. and M.C. went outside, got in her van, and told her that Lantz had touched them inappropriately. She told A.M. to go pack a bag because A.M. was going to stay with her for a while. A.M. and M.C. went back inside the house, where A.M. packed a bag full of clothes. A.M. began living with her grandmother that day and continued to reside with her up until the time of the trial.

After the girls exited the house again, M.C.'s stepfather had arrived and they all went to the police station, where A.M. and M.C. gave statements that Lantz had sexually assaulted them. After giving those statements, A.M. and M.C. were taken to a hospital for sexual assault examinations. A.M. and M.C. provided consistent statements to hospital personnel that Lantz had sexually assaulted them and that the sexual assaults had consisted of digital penetration of the vagina with Lantz' finger.

At the hospital, the underwear of both A.M. and M.C. was collected as evidence because they were still wearing the underwear that they had been wearing when they were assaulted. The

presence of sperm cells, or semen, was confirmed on the inside crotch area of A.M.'s underwear, and Lantz was included as a major contributor of the sperm cells.

As part of the investigation into A.M.'s and M.C.'s allegations, Fairbury police officer David Schmehl interviewed Lantz on the afternoon of January 11, 2011. Schmehl read Lantz his *Miranda* rights and then asked Lantz if he understood why he was being interviewed, to which Lantz responded that his wife, A.M.'s mother, had told him that his stepdaughter, A.M., and her friend, M.C., had accused him of touching them. Lantz denied the allegations. That afternoon, Schmehl arrested Lantz for two counts of misdemeanor sexual assault. Lantz was eventually charged with three counts of first degree sexual assault of a child, each count a Class IB felony.

As part of his followup investigation, Schmehl, along with Investigator Kerry Crosby of the Nebraska Department of Justice, Office of the Attorney General, executed a search warrant at the address in Fairbury, Nebraska, where the assaults allegedly occurred. During this search, executed on March 29, 2012, Crosby used an alternative light source, or black light, to identify biological evidence, resulting in Schmehl and Crosby's seizing three sections of carpet that were cut from the room that was identified as A.M.'s bedroom and a brick that had some "detailing" done to it. A.M. had stated that she placed a decorated brick in front of her bedroom door after she suspected that Lantz was coming into her bedroom at night while she was asleep.

## 2. Motion to Suppress

Lantz filed a motion to suppress evidence obtained during the search of "his living quarters," which was the residence where A.M. and M.C. had alleged that the sexual assaults occurred. A suppression hearing was held on May 17, 2012. Lantz argued that the evidence sought by the affidavit to search his residence was not relevant to the alleged crimes of digital penetration, that the information contained in the affidavit was stale, that the affidavit omitted material facts, and that therefore, there was no probable cause for issuance of the search warrant.

At the suppression hearing, testimony was adduced from Schmehl and Crosby and a certified record containing the affidavit for the search warrant, the search warrant, the return, and an inventory was received into evidence. Crosby's affidavit in support of the search warrant set forth that based upon his experience—which included hundreds of previous investigations dealing with child sexual assaults, child abuse or neglect, and child pornography cases—biological evidence such as semen, blood, vaginal secretions, and epithelial cells can be located years after being placed on items such as fabric or carpet. The biological evidence in places that are climate controlled, such as a house, apartment, or commercial space such as an office building, can be found by using the technology referred to above as an "alternative light source." Crosby also verified that 2 days prior to the search warrant's being sought, the utilities for the house to be searched were in the name of A.M.'s mother.

The district court denied Lantz' motion to suppress in a written order filed on June 21, 2012. The court specifically addressed Lantz' arguments that there was no probable cause for issuance of the warrant because the affidavit was not relevant to the crimes alleged and that the information contained in the affidavit was stale because of a delay of more than a year in seeking the warrant. The district court rejected Lantz' relevancy argument by noting that it was significant that Lantz' semen was found in the underwear that A.M. was wearing during the alleged sexual assault on January 11, 2011, and that A.M. had reason to believe that Lantz was coming into her bedroom at night while she slept and was watching her while she showered. The court also noted that "[i]t is also very significant that A.M. believed Lantz was coming into her room at night while she slept, over a long period of time, she having recalled the first incident to have occurred on December 10, 2009."

The court likewise rejected Lantz' staleness argument, noting that the time span was significant, but that a determination of staleness depends upon the particular circumstances of the case. In the case at hand, the district court evaluated the time

in light of . . . Crosby's statement in his affidavit that biological evidence such as semen can be found years after being deposited within the living quarters of a residence with normal climate control. This fact increases the likelihood of discovering probative DNA evidence a year later when Crosby came into the case and reviewed the investigation done by the Fairbury Police Department. Also, the decorative brick which A.M. described in detail is the type of item which is not likely to be removed from a room.

Thus, the district court found that the county judge could conclude there was a fair probability of finding biological and physical evidence in the areas to be searched at the time the search warrant was to be executed and, under the totality of the circumstances in the case, that the county judge had a substantial basis for finding the affidavit established probable cause. The court rejected Lantz' claim that there were material facts omitted from Crosby's affidavit and further found that even if probable cause was lacking, the evidence would be admissible under the good faith exception of *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984).

### 3. Trial

Trial was held from August 6 through 9, 2012. The evidence established that Lantz was born in May 1968 and that A.M. and M.C. were born in July 1996. The carpet samples which were seized pursuant to the search warrant, the DNA extracts prepared by the Nebraska State Patrol crime laboratory from the carpet samples, and the DNA report that was prepared by the Nebraska State Patrol crime laboratory were admitted at trial over defense objection. On each of the three carpet samples, Lantz was included as a source for the sperm fraction and as a major source for the epithelial fraction of the DNA recovered. The probability of randomly selecting an unrelated individual with a DNA profile matching that of the contributor of the sperm and epithelial fractions in the carpet samples, and of the sperm cells located on the inside of A.M.'s underwear, was calculated at approximately 1 in 18.02 sextillion in the

U.S. Caucasian population, 1 in 12.09 septillion in the African American population, and 1 in 30.45 sextillion in the U.S. Southwest Hispanic population.

A.M. testified as to the previous occasions that Lantz had sexually assaulted her. According to A.M., the first time that Lantz sexually assaulted her was on December 28, 2009. She remembered the date of that first assault clearly because, that same day, she had gotten a text message from her ex-boyfriend saying "'I love you,'" which message was special to her and which she had saved on her cellular telephone for a while. A.M. testified that similarly to the January 2011 incident, the December 2009 assault also happened at night in the living room. A.M. testified that she was lying on her stomach on the couch watching television and had fallen asleep and that when she woke up, Lantz was "fingering [her] vagina." A.M. stated that she was scared during the incident, so she did not let Lantz know that she was awake. A.M. estimated that the assault lasted 5 or 6 minutes, until Lantz went outside to smoke a cigarette. A.M. stated that she did not tell anyone about what had happened because she was scared that if Lantz found out that she had told, he would "do something to [A.M.] and [her] family."

A.M. estimated that between the December 28, 2009, and January 11, 2011, sexual assaults, there were approximately 20 to 25 other similar incidents, all taking place in the living room, where A.M. would wake up and find Lantz' finger was in her vagina. Each time that A.M. would wake up during an assault, she would pretend that she was still sleeping, because she was scared. Other interactions with Lantz also troubled A.M., such as when he gave her a leg massage, when he appeared to be looking through a crack in the bathroom door to watch her shower, and when she woke up from sleeping, in her bed in her bedroom, and found Lantz was leaning over her. After the incident where Lantz was leaning over her in her bedroom, A.M. put a brick in front of her closed bedroom door so that she would be able to tell if Lantz was entering her room while she slept. A.M. testified that she made the brick at Bible camp as a craft project and that it had a church, a cross, and a heart on it. A.M. stated that she was able to determine

that Lantz was entering her room while she slept because the brick was moved a couple of times, and when she and Lantz talked about it, Lantz told her not to put the brick in front of her bedroom door.

### 4. Alleged Prior Sexual
### Assault Evidence

The State sought to offer evidence of similar offenses of sexual assault by Lantz through testimony from Lantz' ex-wife and his former stepdaughter, K.H. Prior to trial, an evidentiary hearing as required by Neb. Rev. Stat. § 27-414 (Cum. Supp. 2012) was held on March 27, 2012. Based upon the evidence presented at the § 27-414 hearing, the district court determined that the State had met its burden of establishing the credibility of K.H.'s testimony by clear and convincing evidence and that the probative value of the evidence outweighed the danger of unfair prejudice. The court also found that statutory factors under § 27-414(3) supported admission of the evidence. Thus, the court determined that K.H.'s testimony was admissible at trial.

When the State sought to introduce testimony from Lantz' ex-wife and K.H. at trial, Lantz objected to his ex-wife's testimony based upon "Rules 403, 404, [and] 414"; the "August [sic] 27," 2012, evidentiary hearing; relevance and "related rules"; and Lantz' rights to due process and a fair trial. Lantz further objected to K.H.'s testimony on the basis of violation of "Rule 403, Rule 404, and Rule 414"; the March 27, 2012, evidentiary hearing; and the violation of Lantz' rights to due process and a fair trial. Additionally, Lantz objected to the trial court's proposed limiting instruction on the basis that the limiting instruction denied Lantz' rights to due process and a fair trial. These objections were all overruled, and Lantz was given a continuing objection to both his ex-wife's and K.H.'s testimony.

Lantz' ex-wife testified that she was married to Lantz from May 2002 to November 2003. At the time of her marriage to Lantz, she had three daughters; the youngest was K.H., who was approximately 5 years old at that time. During her marriage to Lantz, there were times that she and Lantz had to work

different shifts for their jobs and K.H. would be left alone in Lantz' care while his ex-wife worked the day shift.

Prior to bringing K.H. before the jury, the court gave the jury a limiting instruction regarding K.H.'s testimony which provided, "The testimony of [K.H.] relates to [Lantz'] alleged commission of other instances of sexual assault of a child and may be considered for any relevant matter. However, evidence of an alleged prior offense on its own is not sufficient to prove [Lantz] guilty in this case." K.H. was then brought before the jury, where she testified that she was born in August 1997 and that Lantz had been her stepfather. According to K.H., during a time when she was between 4 and 6 years old, when she was home alone with Lantz because her siblings were in school and her mother was at work, Lantz touched her vagina with his hand. K.H. could not remember if Lantz touched her vagina more than once, if Lantz put his finger inside her vagina, or if he touched her inside or outside of her underwear, and she could not remember what season it was when Lantz touched her inappropriately. She also testified that Lantz made her hold his penis with her hand and that "white stuff" came out of his penis. This happened when Lantz was sitting in a recliner in the living room at their house and K.H. was in front of the recliner. K.H. could not remember if Lantz had her hold his penis more than once.

On cross-examination, K.H. testified that she remembered being interviewed at a child advocacy center in February 2012, but that she did "[n]ot really" remember telling the interviewers nothing came out of Lantz' penis when she held it in her hand and that she "[s]omewhat" remembered telling the interviewers that Lantz had touched her vagina over her clothing, not via skin-to-skin contact. K.H.'s interview at the child advocacy center was observed by Schmehl, who testified K.H. reported in that interview that Lantz touched her over her clothing, not via skin-to-skin contact, and that nothing came out of his penis when she held it.

## 5. Alleged Juror Misconduct

During the trial, defense counsel brought to the court's attention that, after the conclusion of the direct examination of

A.M., prior to the start of cross-examination, and just before a break in the trial, Lantz' mother witnessed a concerning interaction between a female juror and A.M. A hearing was held in the court's chambers with Lantz' mother, the court, counsel for the State, and defense counsel present and Lantz not present. Lantz' mother testified under oath that she saw the female juror look at A.M. and give a "big smile and kind of a half nod" and that then, when the juror turned her face back and saw Lantz' mother, the juror acted like she had not "done anything." According to Lantz' mother, she felt like the juror "acknowledged to [A.M.] that she did a good job." Upon questioning by the State, Lantz' mother admitted that she had been in attendance throughout the entire trial but that this was the first type of interaction or exchange between this juror and A.M. that she had witnessed.

Based upon the concerns raised by Lantz' mother, the juror was questioned in chambers regarding potential bias or improper communication. The following colloquy occurred between the district court and the juror, who was placed under oath:

> THE COURT: During the testimony this morning of [A.M.], did you have any nonverbal communication with [A.M.] while she was on the witness stand?
>
> [Juror]: No. The only thing: If she would have looked at me, I would have smiled in comfort. She looked like someone in pain, and I would smile to comfort someone in pain to support her. So if she looked at me — I don't know if she — I would have smiled, yes, and I might have done that. (Juror getting teary-eyed.)
>
> . . . .
>
> THE COURT: . . . During the whole process we had with jury selection and so on, one of the things that was mentioned, and I think also in the preliminary instructions, was to make sure that you listened to all of the evidence.
>
> [Juror]: Uh-huh.
>
> THE COURT: And not make up your mind until you have heard all of the evidence. Do you still feel you're able to do that?

[Juror]: Uh-huh.

THE COURT: That's a yes?

[Juror]: Yes, yes. If I seem emotional, I am. I had no prior knowledge to this. So when I'm hearing this, this is for the first time and I am emotional. So it's not —

. . . .

THE COURT: . . . What you are telling me at the [sic] point is if there was any gesture on your part directed towards [A.M.], it may have been a smile at the conclusion of the testimony before we took the break as a comfort —

[Juror]: Yes, yes. . . .

The attorneys were also given the opportunity to ask the juror questions, and defense counsel did, in fact, cross-examine the juror. Upon cross-examination by defense counsel, the juror stated that she did not have a recollection of nodding her head or smiling at A.M. and that she did not mean to nod at her; however, she stated that she was not denying having done so, she just "didn't make a point to."

After the juror was escorted out of the judge's chambers, defense counsel moved to disqualify the juror and replace her with an alternate. The district court denied the request, stating:

I don't see sufficient grounds at this point for disqualification of the juror. I think a juror expressing some emotion during a trial, particularly, one such as this, is only being human. We ask a lot of jurors to — we don't ask them to be robots, and so the motion is denied.

Defense counsel responded to the district court's ruling with a clarifying statement: "I am not moving to disqualify this juror because she has emotion. I am doing so because of her intent to communicate with a witness. That is my position." In response, the district court stated, "[Y]ou have a point in the testimony of [A.M.] that there was some, perhaps, intent on [the juror's] part, as she put it, to comfort, but I don't think it rises to the level of disqualification."

The trial then resumed with the cross-examination of A.M. Following the completion of A.M.'s testimony, the trial was recessed for a lunch break. Following the lunch break, the

court, outside of the presence of the jury, was informed by counsel that the same juror had given the bailiff a handwritten note. The parties agreed that because the jury had been kept waiting, the issue raised by the juror's note would be taken up at the next break.

During the next break, the issue of the juror's handwritten note was addressed. The note set forth:

> In closed quarters I was asked about a head nod as I was leaving the court room. I really had no recollection of this at the time.
>
> After thinking back I did recall making a head nod. As I stood to leave the jury chair I noticed the juror behind me had stood and left her water bottle. I recall gesturing including a nod to draw her attention to her water bottle. She quietly responded — "I think I'll just leave it[.]"
>
> I feel this gesture may have been misconstrude [sic] as a gesture to [A.M.]
>
> I just wanted to make you aware of this.

Defense counsel renewed his motion to disqualify the juror and replace her with the alternate juror. The district court again overruled the motion, stating, "[T]he Court stands by the previous ruling, if anything, I believe this exhibit is further basis not to grant the motion, and that the juror can continue and be fair and impartial." Following this ruling, defense counsel moved for a mistrial on the bases that the court's ruling on the disqualification of the juror denied Lantz the right to 12 unbiased jurors, in violation of his rights to due process and a fair trial, and that the evidentiary ruling admitting the testimony of Lantz' ex-wife and K.H. invited the jury to make a decision based upon reasons outside the trial of the elements, thereby denying Lantz his rights to due process and a fair trial. The motion for mistrial was overruled, and the trial continued.

### 6. CONCLUSION OF TRIAL AND SENTENCING

After the State rested its case in chief, Lantz renewed his motion to suppress and moved to strike "the evidence in this case, the testimony and exhibits concerning the search"

of Lantz' residence, on the basis that they violated Lantz' Fourth Amendment rights under both the U.S. and Nebraska Constitutions. The district court overruled this motion. Lantz then renewed his motion for mistrial on the grounds previously stated, i.e., that the testimony of his ex-wife and K.H. and the refusal of the disqualification of the juror denied him his rights to due process and a fair trial, which motion was overruled. Lantz then presented evidence in his defense, including testifying in his own behalf. Lantz denied sexually assaulting A.M. and M.C.

The jury convicted Lantz of the charged offenses, and thereafter, he was sentenced to an aggregate term of imprisonment of not less than 30 years, mandatory minimum term, nor more than 50 years. Specifically, on count I, Lantz was sentenced to 15 to 25 years' imprisonment with credit for 149 days served. On count II, Lantz was sentenced to 15 to 25 years' imprisonment with the sentence ordered to run consecutively to that for count I. On count III, Lantz was sentenced to 15 to 25 years' imprisonment with the sentence ordered to run concurrently with the sentences for counts I and II. However, the written order of sentence differed from the oral pronouncement of sentence in that in the written order, in addition to being given credit for 149 days served on count I, Lantz was also granted credit for 149 days served on count III.

## III. ASSIGNMENTS OF ERROR

On appeal, Lantz contends that the district court erred (1) in denying his motion to suppress, (2) in admitting evidence of prior sexual assaults, and (3) in failing to remove a juror who overtly demonstrated sympathy and bias.

## IV. ANALYSIS

### 1. Denial of Motion to Suppress

Lantz contends that the district court erred in denying his motion to suppress evidence obtained in a search of his residence. He contends that the search, conducted more than 14 months after Lantz was arrested, was illegal because it was based upon a warrant (1) issued upon stale allegations and (2) which omitted material facts, i.e., that A.M. had already

testified under oath that she was never assaulted in her bedroom, but only when she slept in the living room.

[1-4] To be valid, a search warrant must be supported by an affidavit which establishes probable cause. *State v. Lee*, 265 Neb. 663, 658 N.W.2d 669 (2003); *State v. Ortiz*, 257 Neb. 784, 600 N.W.2d 805 (1999). Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found. *State v. Lee, supra*; *State v. Ortiz, supra*; *State v. Craven*, 253 Neb. 601, 571 N.W.2d 612 (1997). Proof of probable cause justifying issuance of a search warrant generally must consist of facts so closely related to the time of issuance of the warrant as to justify a finding of probable cause at that time. *State v. Lee, supra*. Probable cause to search is determined by a standard of objective reasonableness, that is, whether known facts and circumstances are sufficient to warrant a person of reasonable prudence in a belief that contraband or evidence of a crime will be found. *Id*.; *State v. Craven, supra*.

[5,6] In reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, an appellate court applies a "totality of the circumstances" rule whereby the question is whether, under the totality of the circumstances illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause. *State v. Ortiz, supra*. As a general rule, an appellate court is restricted to consideration of the information and circumstances found within the four corners of the affidavit. *Id*.

### (a) Staleness

[7,8] Lantz' first argument regarding probable cause in issuing the search warrant is that the information in the affidavit to support the warrant was stale based upon the approximate 14-month time period between his January 11, 2011, arrest and the execution of the search warrant on March 29, 2012.

> """[T]here is no bright-line test for determining when information is stale. Whether the averments in an affidavit are sufficiently timely to establish probable cause depends on the particular circumstances of the case,

and the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit. Time factors must be examined in the context of a specific case and the nature of the crime under investigation." . . .'"

*State v. Bossow*, 274 Neb. 836, 848, 744 N.W.2d 43, 53 (2008), quoting *State v. Faber*, 264 Neb. 198, 647 N.W.2d 67 (2002). Where the facts contained in an affidavit indicate an isolated violation of the law, it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time; however, where the facts contained in an affidavit indicate protracted and continuous criminal activity or, in other words, a course of conduct, the passage of time becomes less significant. See, *State v. Bossow, supra*; *State v. Faber, supra*.

"The ultimate criterion in determining the degree of evaporation of probable cause . . . is not case law but reason. The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime . . . , of the criminal . . . , of the thing to be seized . . . , of the place to be searched . . . , etc. The observation of a half-smoked marijuana cigarette in an ashtray at a cocktail party may well be stale the day after the cleaning lady has been in; the observation of the burial of a corpse in a cellar may well not be stale three decades later. The hare and the tortoise do not disappear at the same rate of speed."

*State v. Groves*, 239 Neb. 660, 680, 477 N.W.2d 789, 802-03 (1991) (Shanahan, J., concurring; Caporale, J., joins), quoting *Andresen v. State*, 24 Md. App. 128, 331 A.2d 78 (1975). Thus, staleness must be determined by the character or nature of the evidence sought.

For example, in *State v. Bossow, supra*, the Nebraska Supreme Court held that a delay between information in the affidavit establishing that three individuals saw marijuana plants growing under a heat lamp at the defendant's residence and the issuance of a search warrant approximately 1 month

later did not render the search warrant too stale to establish probable cause. The affidavit in support of the search warrant set forth that marijuana plants can take up to 22 weeks to mature and can grow to over 8 feet tall. The largest marijuana plant described in the affidavit was approximately 4 feet tall, with the other plants much smaller than that, indicating that the plants were in the early stages of development and unlikely to be harvested in the near future or removed from the defendant's residence. Thus, the Nebraska Supreme Court held that given the particular circumstances of the defendant's case, the passage of time was not fatal to the trial court's finding of probable cause.

Conversely, in *State v. Reeder*, 249 Neb. 207, 543 N.W.2d 429 (1996), *overruled on other grounds, State v. Davidson*, 260 Neb. 417, 618 N.W.2d 418 (2000), the Nebraska Supreme Court held that information in an affidavit regarding the defendant's alleged prior drug activities which dated from 4 months to 10 years in the past was stale information and could not be used to support probable cause for a warrant. Relying on *State v. Reeder*, this court held similarly in *State v. Valdez*, 5 Neb. App. 506, 562 N.W.2d 64 (1997), finding that information detailing a defendant's alleged drug activities dating 6 months to 5 years prior to the affidavit was not so closely related to the time of the issuance of the warrant as to justify a finding of probable cause at that time.

Unlike the aforementioned cases, which concerned drug activities, in the instant case, we are dealing with an affidavit seeking biological or DNA evidence. By its nature, such evidence is of a type that may be found years after its deposit. See *People v. Miller*, 75 P.3d 1108, 1113 n.3 (Colo. 2003) ("[t]he type of evidence and activity involved is important[; s]ome types of evidence the police seek to obtain through a search warrant may be relatively immune from becoming stale, for example, DNA evidence at the specified location"). Although Nebraska appellate courts have not considered the issue of the staleness of information contained in the affidavit for a search warrant seeking DNA or other biological evidence, the question has been addressed by other state courts. For example, in *State v. Daniels*, 234 Or. App. 533, 228 P.3d 695 (2010),

the Oregon Court of Appeals held that facts contained in an affidavit which included the defendant's alleged sexual abuse of adopted and biological daughters over 20 years prior and a statement by a male foster child who, for a period of time ending 9 months prior to the warrant application, had regularly witnessed the defendant sexually abusing the child's 13-year-old sister by rubbing her crotch and vaginal area were sufficient to justify a search warrant for photographs and videotapes. The Oregon Court of Appeals noted that evidence of inculpatory sexual activity, such as fluids on bedding or undergarments, "unlike drugs, is not consumable or marketable, nor is it likely to dissipate (DNA, for example, lasts for millennia); therefore, it is not necessarily 'stale' after a short time." *Id*. at 539, 228 P.3d at 699. Likewise, in *State v. Lejeune*, 277 Ga. 749, 594 S.E.2d 637 (2004), the Georgia Supreme Court held that facts contained in an affidavit justifying a warrant to search a home for a vise and for blood evidence were not stale where an alleged murder occurred more than 5 years prior and where the affidavit stated that there was a reasonable belief that the blood evidence would still be found because blood does not degrade when protected from the elements.

Lesser time periods between the crime and the affidavit to obtain the search warrant were approved in *Carruthers v. State*, 272 Ga. 306, 528 S.E.2d 217 (2000), *overruled on other grounds*, *Vergara v. State*, 238 Ga. 175, 657 S.E.2d 863 (2008); *People v. Cullen*, 695 P.2d 750 (Colo. App. 1984); and *State v. Veley*, 37 Or. App. 235, 586 P.2d 1130 (1978). In *Carruthers v. State, supra*, an affidavit used to obtain a warrant to search a murder defendant's residence for a leather jacket, a handgun, and bloodstained clothing was not stale, even though the crime had occurred 6 months earlier, where the affidavit stated specifically that the affiant had interviewed the defendant's accomplice 4 days earlier and had learned that on the night of the murder, the defendant wore a leather jacket to conceal blood on him, had washed bloody clothes rather than discarding them, and had possessed a handgun and stated specifically that the defendant had been incarcerated for most of the time since the murder, suggesting that he would have had limited opportunity to dispose of evidence. Likewise, in

*People v. Cullen, supra*, facts contained in an affidavit justifying a warrant to search sites for evidence, including scientific evidence such as hair, fibers, blood, and fingerprints, was not stale even though the crimes were perpetrated 8 months prior to the application for the search warrants. Similarly, in *State v. Veley, supra*, the Oregon Court of Appeals found that an affidavit used to obtain a warrant authorizing a search of a car for semen stains on its seats was not stale even though the last sexual act occurred over 90 days prior to the application for the warrant, because semen stains were a condition that was likely to continue for a prolonged period of time.

In the instant case, there were approximately 14 months between the time of the last alleged sexual assault, which occurred on January 11, 2011, and the execution of the search warrant on March 29, 2012. Crosby's affidavit in support of the search warrant set forth that based upon his experience, which included hundreds of previous investigations dealing with child sexual assaults, child abuse or neglect, and child pornography cases, biological evidence such as semen, blood, vaginal secretions, and epithelial cells can be located years after being placed on items such as fabric or carpet. The affidavit further set forth that biological evidence can be found in places that are climate controlled, such as a house, apartment, or commercial space such as an office building, by using technology referred to as an "alternative light source." Because the search warrant sought DNA evidence inside a residence, which evidence was not likely to be degraded, the information contained in the affidavit was not stale even though there had been over 14 months between the last alleged sexual assault and the execution of the search warrant. Therefore, this assignment of error is without merit.

### (b) Omission of Material Facts

Lantz' second argument regarding probable cause in issuing the search warrant is that Crosby's affidavit in support of the search warrant materially omitted the fact that A.M. testified at the pretrial hearing, 4 months before the issuance of the search warrant, that Lantz sexually assaulted her in the living room only.

[9-11] Omissions in an affidavit used to obtain a search warrant are considered to be misleading when the facts contained in the omitted material tend to weaken or damage the inferences which can logically be drawn from the facts as stated in the affidavit. *State v. Thomas*, 267 Neb. 339, 673 N.W.2d 897 (2004), *abrogated on other grounds, State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009). However, a defendant who seeks to suppress evidence obtained under a search warrant has the burden of establishing that the search warrant is invalid so that evidence secured thereby may be suppressed. *State v. Thomas, supra*. The role of an appellate court is to determine whether the affidavit used to obtain a search warrant, if it contained the omitted information, would still provide a magistrate or judge with a substantial basis for concluding that probable cause existed for the issuance of the warrant. *Id*. If a substantial basis for probable cause would still exist, then the defendant's argument fails. *Id*.

As Crosby set forth in his affidavit in support of the search warrant, A.M. believed that Lantz was coming into her bedroom at night while she was asleep and she had placed a brick by her bedroom door to try to determine if Lantz was entering her bedroom at night while she was sleeping. Additionally, Lantz' semen was found on the inside crotch area of the underwear A.M. wore at the time of the last sexual assault, which occurred on January 11, 2011. Based upon these facts, the omission that A.M. had testified at the preliminary hearing that no sexual assaults had occurred in her bedroom was not misleading and a substantial basis for probable cause for issuance of the search warrant existed. Consequently, Lantz' argument is without merit.

## 2. Admission of Evidence of Prior Sexual Assaults

Lantz also contends that the district court erred in admitting evidence of prior sexual assaults under "Rule 414" where there was no clear and convincing evidence that the prior sexual assaults occurred.

[12,13] Section 27-414 is a new Nebraska evidentiary rule that became operative on January 1, 2010. *State v. Craigie*, 19

Neb. App. 790, 813 N.W.2d 521 (2012). In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013); *State v. Kibbee*, 284 Neb. 72, 815 N.W.2d 872 (2012). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Valverde, supra*; *State v. Kibbee, supra*.

Under § 27-414(1), evidence of a criminal defendant's commission of another sexual assault offense is admissible "if there is clear and convincing evidence otherwise admissible under the Nebraska Evidence Rules that the accused committed the other offense or offenses. If admissible, such evidence may be considered for its bearing on any matter to which it is relevant."

Lantz contends that the State failed to establish by clear and convincing evidence that the prior sexual assaults occurred, because K.H. could not place the alleged sexual assaults in context by season, date, or hour, except to state that the assaults occurred before she started kindergarten at age 6; she made inconsistent statements regarding whether Lantz touched her via skin-to-skin contact or over her clothing and whether Lantz ejaculated; and she delayed in reporting the alleged assaults for over 8 years.

However, despite K.H.'s inability to provide details regarding the exact timing of the assaults, which is common in the testimony of a child attempting to recount traumatic events, there were notable similarities between the prior acts involving K.H. and the acts involving A.M.: Both victims were Lantz' stepdaughters, both victims were under the age of majority at the time the sexual assaults occurred, both victims were sexually abused while they were alone with Lantz (except for the last sexual assault alleged against A.M., which occurred in the presence of M.C.), and the sexual assaults occurred in the living rooms of the victims' respective houses. Finally, although the incidents with K.H. occurred at least 6 years prior

to the first time that Lantz sexually assaulted A.M., the question of whether evidence of other conduct """"is too remote in time is largely within the discretion of the trial court. While remoteness in time may weaken the value of the evidence, such remoteness does not, in and of itself, necessarily justify exclusion of the evidence.""'" *State v. Valverde*, 286 Neb. at 295, 835 N.W.2d at 744, quoting *State v. Kibbee, supra*. Thus, the district court did not abuse its discretion in finding that the State met its burden by clear and convincing evidence and this assignment of error is without merit.

### 3. Failure to Remove Juror

Lantz contends that the district court erred in refusing to remove a juror who had overtly demonstrated sympathy and bias during his trial, thereby denying him his constitutional right to an impartial jury.

[14] The issue of the retention of a juror after the commencement of trial is a matter of discretion for the trial court. See *State v. Hilding*, 278 Neb. 115, 769 N.W.2d 326 (2009).

[15] A criminal defendant claiming jury misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of jury misconduct and (2) that such misconduct was prejudicial to the extent that the defendant was denied a fair trial. *State v. Harris*, 264 Neb. 856, 652 N.W.2d 585 (2002); *State v. Harrison*, 264 Neb. 727, 651 N.W.2d 571 (2002); *State v. Jackson*, 255 Neb. 68, 582 N.W.2d 317 (1998); *State v. Anderson*, 252 Neb. 675, 564 N.W.2d 581 (1997) (specifically overruling *State v. Owen*, 2 Neb. App. 195, 508 N.W.2d 299 (1993), which had set forth heightened "clear and convincing" evidentiary standard for proving prejudice in criminal jury misconduct cases). But see, *State v. Robinson*, 272 Neb. 582, 724 N.W.2d 35 (2006), *abrogated on other grounds, State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010) (in criminal case involving juror behavior only, burden to establish prejudice rests on party claiming misconduct, which must be demonstrated by clear and convincing evidence); *State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002) (also setting forth "clear and convincing evidence" standard).

[16-18] The competency of a juror is generally presumed, and the burden is on the challenging party to establish otherwise. *State v. Krutilek*, 254 Neb. 11, 573 N.W.2d 771 (1998). A trial judge is not required to excuse a juror when the juror is able to decide the case fairly and impartially. See *id*. An appellate court defers to the trial court's decision whenever a juror is unequivocal that he or she can be fair or impartial. *Howe v. Hinzman*, 14 Neb. App. 544, 710 N.W.2d 669 (2006). This rule applies both to the issue of whether a potential juror should be removed for cause prior to trial and to the situation of whether a juror should be removed after the trial has commenced. See *id*.

In the instant case, once the concerns regarding the juror were brought to the trial court's attention, the court immediately addressed the issue by holding a hearing. The juror stated, under oath, that she may have smiled at the witness, A.M., but that she was not certain she did so and that she would not make up her mind until she had heard all of the evidence in the case. Further, in her note to the court, the juror denied nodding at A.M., stating that she was gesturing to a fellow juror who had forgotten a water bottle.

Because Lantz has alleged jury misconduct, he bears the burden of proving, by a preponderance of the evidence, both the existence of misconduct and prejudice to the extent that he was denied a fair trial. He fails in both respects: He cannot establish misconduct, because the juror denied nodding at A.M. and could not remember if she smiled at A.M., and he cannot establish prejudice, because the juror unequivocally stated that she would not make up her mind as to Lantz' guilt or innocence until she heard all of the evidence in the case. The district court held a hearing and carefully exercised its discretion on this matter, and no abuse of that discretion is evidenced by the record.

### 4. PLAIN ERROR REGARDING SENTENCING

[19-21] In its brief and at oral argument, the State brought to this court's attention errors regarding Lantz' sentencing, which we address under our authority to note plain error. An

appellate court always reserves the right to note plain error which was not complained of at trial or on appeal. *State v. Scott*, 284 Neb. 703, 824 N.W.2d 668 (2012); *State v. Hilding*, 278 Neb. 115, 769 N.W.2d 326 (2009). Consideration of plain error occurs at the discretion of an appellate court. *State v. Magallanes*, 284 Neb. 871, 824 N.W.2d 696 (2012), *cert. denied* ___ U.S. ___, 133 S. Ct. 2359, 185 L. Ed. 2d 1082 (2013); *State v. Howell*, 284 Neb. 559, 822 N.W.2d 391 (2012). Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Reinpold*, 284 Neb. 950, 824 N.W.2d 713 (2013).

Lantz was convicted of three counts of first degree sexual assault of a child, all Class IB felonies, which are punishable by 20 years' to life imprisonment. See, Neb. Rev. Stat. § 28-105 (Reissue 2008); Neb. Rev. Stat. § 28-319.01 (Cum. Supp. 2012) (first degree sexual assault of child). However, although classified as a Class IB felony, first degree sexual assault of a child carries a mandatory minimum sentence of 15 years' imprisonment for the first offense. § 28-319.01(2).

On count I, Lantz was sentenced to 15 to 25 years' imprisonment with credit for 149 days served. On count II, Lantz was sentenced to 15 to 25 years' imprisonment with the sentence ordered to run consecutively to that for count I. On count III, Lantz was sentenced to 15 to 25 years' imprisonment with the sentence ordered to run concurrently with the sentences for counts I and II.

The State argued at oral argument that because Class IB felonies carry a 20-year minimum term of imprisonment, Lantz' sentences, which contain a 15-year mandatory minimum term of imprisonment, were not within the statutory sentencing range. The State contends that the sentencing statutes require the minimum portion of Lantz' sentences to be 20 years' imprisonment, of which 15 years is a mandatory minimum sentence *not subject to good time*. We disagree with the State's argument.

[22] Although § 28-105 sets forth that a Class IB felony is punishable by 20 years' to life imprisonment, § 28-319.01(2) provides that even though classified as a Class IB felony, first degree sexual assault of a child carries a mandatory minimum sentence of 15 years' imprisonment for the first offense. Since the statutes provide for different minimum sentences for the same offense, there is a conflict between the two statutes regarding the minimum sentence for a conviction of first-offense first degree sexual assault of a child. When there is a conflict between statutes, we are guided by the principle that to the extent there is a conflict between two statutes, the specific statute controls over the general statute. *State v. Hernandez*, 283 Neb. 423, 809 N.W.2d 279 (2012). In this circumstance, the Legislature has made a specific provision that the offense of first-offense first degree sexual assault of a child, even though classified as a Class IB felony, carries a mandatory minimum sentence of 15 years' imprisonment. This specific statute controls over the general statute regarding sentences providing for a 20-year minimum term of imprisonment. See *State v. Fleming*, 280 Neb. 967, 982, 792 N.W.2d 147, 159 (2010) (defendant's 20- to 40-year sentences for two convictions of first degree sexual assault of child were not excessive where minimum sentence was "just 5 years more than the mandatory minimum for the crimes for which he was convicted").

[23,24] Although each of the sentences imposed was within the statutory sentencing range, the portion of the sentencing order providing that the sentence for count III was to run concurrently with the sentences for counts I and II contradicts the Nebraska Supreme Court's holding in *State v. Castillas*, 285 Neb. 174, 826 N.W.2d 255 (2013), which provides that the sentence for any conviction carrying a mandatory minimum sentence must be ordered to be served consecutively. "Mandatory minimum sentences cannot be served concurrently. A defendant convicted of multiple counts each carrying a mandatory minimum sentence must serve the sentence on each count consecutively." *Id*. at 191, 826 N.W.2d at 268. Thus, we must remand with directions that the district court resentence Lantz on count III to provide that this sentence

must be served consecutively to those for counts I and II. See, *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006) (appellate court has power on direct appeal to remand cause for imposition of lawful sentence where erroneous one has been pronounced); *State v. Wilson*, 16 Neb. App. 878, 754 N.W.2d 780 (2008).

[25-27] Additionally, we note that the written sentencing order differs from the court's oral sentencing pronouncement by providing that Lantz is to receive credit for 149 days served on count III. A sentence validly imposed takes effect from the time it is pronounced. *State v. Marrs*, 272 Neb. 573, 723 N.W.2d 499 (2006). When a valid sentence has been put into execution, the trial court cannot modify, amend, or revise it in any way, either during or after the term or session of court at which the sentence was imposed. *Id*. When there is a conflict between the record of a judgment and the verbatim record of the proceedings in open court, the latter prevails. *State v. Herngren*, 8 Neb. App. 207, 590 N.W.2d 871 (1999). Because the district court orally pronounced valid sentences, the oral pronouncement controls and, upon remand, Lantz will not receive credit for time served on count III.

## V. CONCLUSION

Having considered and rejected Lantz' assignments of error, we affirm his convictions. Additionally, Lantz' sentences are affirmed with the following exception: We vacate the portion of Lantz' sentence on count III where the court ordered the sentences to run concurrently and remand the cause with directions for the court to order the sentences to be served consecutively.

Affirmed in part, and in part vacated and remanded for resentencing.